[No G024911. Fourth Dist., Div. Three. Jan. 28, 2000.]

BRIAN C., Plaintiff and Appellant, v.
GINGER K., Defendant and Respondent.

COUNSEL

Law Offices of Jeffrey W. Doeringer and Jeffrey W. Doeringer for Plaintiff and Appellant.

Margorie G. Fuller, Tovstein & Kraetzer and Marc C. Tovstein for Defendant and Respondent.

OPINION

**SILLS, P. J.—**

## I. INTRODUCTION

The trial court granted summary judgment in this "conclusive presumption" and "standing" paternity case even though the plaintiff had lived with the mother (a woman married to someone else), raised the child as his own for the first year of the child's life, and continued to visit the child after he and the mother broke up. For the trial court, the facts that the child was conceived while the mother was cohabiting with her husband and that her husband was neither impotent nor sterile were *absolutely* dispositive.

We reverse. As a group of California Supreme Court and United States Supreme Court cases demonstrate, there are times when the due process clause of the federal Constitution precludes states from applying substantive rules of paternity law which have the effect of terminating an *existing*

father-child relationship. This case is one of them. In particular, because the child was *not* "born into" an extant marital union (in any meaningful sense) and because the plaintiff developed a substantial parent-child relationship with the child immediately upon her birth and for a year and one-half thereafter, he *can* bring an action to be declared the legal father of the child. We also show that because the plaintiff received the child into his house he has statutory standing to bring the action.

## II. FACTS

The facts in this case require a preliminary procedural explanation. Brian filed this action to establish a parent-child relationship with then two-year-old Kennedy in April 1998; the defendant, Ginger (Kennedy's mother), almost immediately filed a summary judgment motion. The trial court *took evidence* in a hearing preparatory to the summary judgment motion, but that evidence was limited to the questions of whether Ginger was cohabiting with her husband, William, at the time of Kennedy's conception (the court found she was), and whether William was sterile or impotent (the court found he wasn't). Our statement of facts therefore reflects both the trial court's implied findings on the cohabitation and fertility issues (where the winning party, Ginger, receives the benefit of any conflicts in the evidence or reasonable inferences therefrom), and traditional rules for evaluating evidence on summary judgment motions on all other issues (where the losing party, Brian, receives the benefit of any conflicts and inferences):

Ginger married William in March 1994. She met Brian in December 1994. Ginger and Brian commenced an affair that month. In late January 1995, the two of them had sex in a Las Vegas hotel room, and it was about that time that Ginger's daughter, Kennedy, was conceived. However, during this period of time (that is, late January and early February 1995) Ginger also continued to live with her husband, William, and had sex with him too. In March, Ginger left her husband and moved into an apartment which she rented with Brian. Kennedy was born in October 1995. Brian was present at Kennedy's birth, and his name appears as her father on her birth certificate and on her baptismal records.

Brian doted on Kennedy: feeding, holding, bathing, rocking, walking, and soothing her, and "tending to her every need" (as he put it in his declaration in opposition to the summary judgment motion). In a letter from Ginger written soon after Kennedy's birth, he was described as doing a "great job as a Dad" (though Ginger noted that he didn't change diapers and was able to sleep through the baby's awakening every two hours). Indeed, judging from pictures submitted in opposition to the summary judgment motion, Brian and

Ginger presented to the world the veritable picture of happy unwedded domesticity reminiscent of the last scene in Four Weddings and a Funeral.[1]

Happily ever after, however, lasted for only a year or so after the child's birth. For reasons not disclosed in the record, Ginger and Brian "broke up" in November 1996. However, Brian continued to see Kennedy after work each day and had custody on weekends until May 1997, when Ginger unilaterally "cut off all contact" because she and her husband William were reconciling. Brian continued to "try" to see Kennedy, calling Ginger and leaving messages "all to no avail." Brian was injured on the job and could not work, so he had no income; he tried to be "patient and wait" rather than immediately institute litigation.

Eventually, though, he decided he could wait no longer and hired a paralegal to help him file this paternity action, which he did in propria persona on April 1, 1998. On April 15 of that month—a remarkably short time by the standards of civil litigation—Ginger responded with a motion for summary judgment.

An evidentiary hearing preparatory to the court's ruling on the summary judgment motion was completed in November 1998, which resulted in findings that Ginger and her husband William were indeed cohabiting at the time of Kennedy's conception and that William was not impotent or sterile. The trial court granted the summary judgment motion based on the fact that cohabitation at the time of conception would trigger the conclusive presumption. While this court denied Brian writ relief in the wake of the summary judgment, we expedited his appeal.

Brian's opposition papers to Ginger's summary judgment motion requested DNA tests, but the trial court made no ruling on the record and it appears that, to date, no tests have been made.

### III. Discussion

#### A. *Preliminary Observations About the Relevant Statutes*

The law concerning children born to married women when there is a dispute over paternity is a latter-day admixture of ancient common law presumptions and ideas, statutes, statutory interpretation and legislative

---

[1](Working Title Films, Poly-Gram Filmed Entertainment 1994.) The movie is a romantic comedy involving single people who get invited to a series of weddings which ends with the male and female protagonists deciding *not* to have a wedding of their own, but to live together in *un*wedded bliss and have a child.

acquiescence, common law accretion and constitutional imperatives, all in the face of the technological ability, developed only recently, to *positively* identify who a biological father really is. Given the disparate nature of the mix, it is a good idea at the outset of our discussion to review a number of basic ideas and distinctions which affect the area:

### 1. *The Conclusive Presumption*

The great "conclusive presumption" to which the cases refer is currently found in Family Code section 7540. It was formerly set forth in section 621 of the Evidence Code, and before that in subdivision 5 of section 1962 of the Code of Civil Procedure. The language of the statute is, in its entirety: "Except as provided in Section 7541 [which provides for the use of blood tests], the child of a wife cohabiting with her husband, who is not impotent or sterile, is *conclusively presumed to be a child of the marriage*." (Italics added.)

As our Supreme Court remarked back in *Estate of McNamara* (1919) 181 Cal. 82, 91 [183 P. 552, 7 A.L.R. 313] (*McNamara*), a literal reading of the text would suggest that the presumption would only apply if the wife was cohabiting with the husband at the time of *birth*.[2] ■ However, originating with considered dicta in the *McNamara* case, the words "wife cohabiting with her husband" have been judicially construed to mean cohabiting at the time of *conception*, not cohabiting at the time of *birth*. It is too late in the day for us to consider interpreting the statute according to its otherwise plain meaning; the trial court here was therefore correct in identifying the time of conception as the benchmark for the cohabitation issue.[3]

While nominally a rule of evidence, there is no doubt that the conclusive presumption is a substantive rule of law, an observation first made by the

---

[2]In 1919, when the statute was in section 1962, subdivision 5 of the Code of Civil Procedure, the text was: " 'The issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate.' " (*McNamara, supra*, 181 Cal. at p. 91.)

[3]Without mentioning any authority or elaborating on the point, the *McNamara* court observed that "putting upon the section the meaning it undoubtedly *should* have, namely that issue of a wife cohabiting with her husband at the time of conception must be indisputably presumed legitimate . . . ." (*McNamara, supra*, 181 Cal. at p. 91, italics added.) The court did not say why the section "undoubtedly should" be interpreted to refer only to conception, but it is easy to guess: That interpretation is the only one which would be entirely consonant with conception being the result of licit sexual relations, even though it would mean that the conclusive presumption would not necessarily apply in the case of the proverbial shotgun wedding.

Whether the 1919 high court's gloss on the text *qua* text (i.e., its refusal to read it literally) could ultimately withstand critical scrutiny is, at this juncture, an academic matter. As the Court of Appeal observed in *City and County of San Francisco v. Strahlendorf* (1992) 7 Cal.App.4th 1911, 1914 [9 Cal.Rptr.2d 817], the statute has been interpreted that way since

California Supreme Court in *Kusior v. Silver* (1960) 54 Cal.2d 603, 619 [7 Cal.Rptr. 129, 354 P.2d 657] ("A conclusive presumption is in actuality a substantive rule of law . . ."), later reiterated by the Court of Appeal in *In re Marriage of B.* (1981) 124 Cal.App.3d 524, 528 [177 Cal.Rptr. 429], and *Vincent B. v. Joan R.* (1981) 126 Cal.App.3d 619, 623 [179 Cal.Rptr. 9], and then finally picked up in Justice Scalia's plurality opinion for the United States Supreme Court in *Michael H. v. Gerald D.* (1989) 491 U.S. 110, 119-120 [109 S.Ct. 2333, 2340, 105 L.Ed.2d 91] (*Michael H.*). As the *Vincent B.* court said, the conclusive presumption is essentially a social policy statement made by the Legislature "that the integrity of the family unit should not be impugned." (*Vincent B., supra*, 126 Cal.App.3d at p. 623.)

Sometimes, the conclusive presumption has not been applied as a matter of its inherent statutory *scope*. For example, in *McNamara* there was simply too long a period from the time when the husband and wife even *might* have been cohabiting to the child's birth, and so the court simply refused to "apply" the statutory presumption, because the "laws of nature" (i.e., biology) precluded it. (See *McNamara, supra*, 181 Cal. at p. 96 ["The courts must reason in accordance with the usual operation of the law of nature . . ."]; see also *Whitney v. Whitney* (1959) 169 Cal.App.2d 209, 217 [337 P.2d 219] [conclusive presumption did not apply where period was 297 days from conception to birth].) Similarly, in *Anderson v. Anderson* (1931) 214 Cal. 414 [5 P.2d 881], the period of cohabitation between husband and wife to the birth of the child was too *short*, and so the court again refused to apply the presumption. (See *id.* at p. 417 ["it is presumed . . . that things have happened in the ordinary course of nature"].)[4]

Similarly, the presumption is not applied (as a matter of its scope) where there has been no substantive cohabitation. (See *Steven W. v. Matthew S.*

*McNamara* and has been "universally accepted by legal commentators." (See *Strahlendorf, supra*, 7 Cal.App.4th at p. 1914.)

[4] While our review of the basic ideas in the area suggests a certain doctrinal uniformity in the cases, that uniformity breaks down when one examines the reason which the *McNamara* and *Anderson* courts gave for the conclusive presumption in the first place: Namely, that it is the law's way of coping with the (at least historical) biological fact of paternal uncertainty. The problem of uncertainty, or "indeterminability" as the *McNamara* court put it, led the court to note "one class of cases" where the conclusive presumption was not applied, i.e., where the child was a different race than the husband. (See *McNamara, supra*, 181 Cal. at p. 96, citing cases from Virginia, Alabama, Georgia, and New York.) The high court then elaborated: "The reason why the conclusive presumption is not applied in such instances is that *the element of indeterminability which is the reason for the presumption* in the ordinary case is absent. *It is clear that the husband is not the father.* The actual fact, in other words, is *capable of definite determination*, and for this reason the conclusive presumption which is *a substitute for such determination* is not properly applicable." (*Ibid.*, italics added.) And in *Anderson v. Anderson, supra*, 214 Cal. at page 417, the high court said pretty much the same thing: "[W]e are here not called upon to weigh the probabilities, for we have a case where *the fact* of prenuptial

(1995) 33 Cal.App.4th 1108, 1115 [39 Cal.Rptr.2d 535] [separated wife's stolen weekend tryst with husband not enough to constitute cohabitation for purposes of presumption]; *Comino v. Kelley* (1994) 25 Cal.App.4th 678, 681 [30 Cal.Rptr.2d 728] [marriage in name only, no sex]; *City and County of San Francisco v. Strahlendorf, supra*, 7 Cal.App.4th at pp. 1914-1915 [because husband and wife not living together at time of conception, it was error to apply conclusive presumption]; see also *Kusior v. Silver, supra*, 54 Cal.2d at p. 616 [cohabiting means " 'living together as husband and wife' "].) Nor is it applied if there is no valid marriage. (See *Alicia R. v. Timothy M.* (1994) 29 Cal.App.4th 1232, 1238 [34 Cal.Rptr.2d 868] ["While the state has a legitimate interest in promoting marriage and not impugning a family unit, that interest cannot be served here where there is no marital union or family unit to disrupt"].)[5]

---

pregnancy by a stranger is established beyond question, and the presumption of legitimacy no longer obtains." (Italics added.)

These passages, if read in isolation, suggest that the underlying reason for the conclusive presumption has, given the development of DNA tests, now disappeared. There need now be no "indeterminability" when it comes to paternity; in the words of the *Anderson* court, "the fact" of paternity by a stranger can now be established "beyond question." (*Anderson v. Anderson, supra*, 214 Cal. at page 417; see also *In re Marriage of B.* (1981) 124 Cal.App.3d 524, 528 [177 Cal.Rptr. 429] ["Early California cases were able to justify the conclusive presumption in question on the ground that no competent evidence could be adduced to indicate who among those who had had intercourse with the wife during the period of possible conception was the biological father of the child born to her"].)

However, there was a shift in the common law afterwards: "[A]s blood tests became scientifically reliable so that they could exclude a husband as the biological father, the courts sustained the legislative mandate by unabashedly calling it a substantive rule of law." (*In re Marriage of B., supra*, 124 Cal.App.3d at p. 528; see also *Michael H., supra*, 491 U.S. 110, 119 [109 S.Ct. 2333, 2340] (plur. opn. of Scalia, J.) ["that rule of evidence is the implementation of a substantive rule of law"].) The basis for that *substantive* rule was to prevent the integrity of the family from being impugned when husband and wife are living together as such. (See *Kusior v. Silver, supra*, 54 Cal.2d at p. 619.)

[5]This court's opinion in *County of Orange v. Leslie B.* (1993) 14 Cal.App.4th 976 [17 Cal.Rptr.2d 797] (*Leslie B.*), is properly classified within the "scope" category as well, but a little explanation is necessary. In *Leslie B.*, a married woman cohabiting with her husband had an affair at the time of conception. She left her husband and "divorced shortly thereafter," gave birth without telling either her ex-husband or her paramour, and then went on welfare. When the county sued the paramour for reimbursement, his defense was that the conclusive presumption meant he could not be the father. This court rejected the defense, because the "policies" behind the presumption were not furthered; Justice Wallin wryly noted that the presumption "was never intended as a financial prophylactic for men who have affairs with married women." (*Id.* at p. 981.)

While the three cases which the *Leslie B.* court cited in support of the "furtherance of policies" rationale all addressed the problem of paternity in terms of *constitutional* due process (*Michelle W. v. Ronald W.* (1985) 39 Cal.3d 354 [216 Cal.Rptr. 748, 703 P.2d 88]; *In re Lisa R.* (1975) 13 Cal.3d 636 [119 Cal.Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017] (*Lisa R.*); and *In re Melissa G.* (1989) 213 Cal.App.3d 1082 [261 Cal.Rptr. 894]) (*Melissa G.*), the result in *Leslie B.* was still ultimately a *statutory* one: Application of the presumption led to a "ridiculous result" because there was no family unit to be preserved. (*Leslie B., supra*, 14

### 2. *The Rebuttable Presumptions*

In addition to the single conclusive presumption, there are several *rebuttable* presumptions which may result in a man being presumed to be the natural father of a child. The core theme of the first three of these rebuttable presumptions is the marriage (or attempted marriage) of the natural father to the natural mother. Thus the statute begins with a rebuttable presumption for situations in which a child is either born during a marriage (even if not conceived during it) or might have been conceived during it,[6] and follows it up with similar presumptions in cases of invalid marriages and cases where the father marries or attempts to marry the natural mother after the child is born.[7] Another rebuttable presumption occurs when a man receives a child into his home and openly holds out the child as his natural child. (§ 7611, subd. (d).)

Because there are several rebuttable presumptions of natural fatherhood, a separate statute, Family Code section 7612, subdivision (b), deals with the problem of what happens when two or more of the presumptions collide. Section 7612, subdivision (b) requires courts to favor the presumption which "is founded on the weightier considerations of policy and logic." (See Fam. Code, § 7612, subd. (b) ["If two or more presumptions arise under Section 7611 which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls"].)

### 3. *Statutory Standing Rules*

Finally, *standing* on the part of a biological father to even bring an action to establish his paternity in a child otherwise covered by the conclusive presumption is governed by two statutes, Family Code sections 7630 and 7631. Section 7630 divides itself into three parts: Subdivision (a) affords standing to a man who is married to, or at least tried to marry (even if the marriage were invalid), the mother. It also affords standing to the natural

---

Cal.App.4th at p. 983.) In that sense, perhaps the better citations would have been to *McNamara* and *Anderson*, in which our high court also construed the statutory presumption to avoid ridiculous results at odds with the actual facts of the case.

[6]The text of the Family Code section 7611, subdivision (a) is: "A man is presumed to be the natural father of a child if he meets the conditions provided in Chapter 1 (commencing with section 7540 [i.e., the conclusive presumption]) or Chapter 3 (commencing with Section 7570 [which provides for a system of voluntary paternity in the case of *unwed mothers*]) of Part 2 or in any of the following subdivisions: [¶] (a) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a judgment of separation is entered by a court."

[7]See Family Code section 7611, subdivisions (b) and (c).

mother and the child.[8] Subdivision (b) gives standing to any interested party based on the traditional rule that a child could be legitimized if the father received the child into his home and openly held out the child as his own.[9] (See generally *In re McGrew* (1920) 183 Cal. 177 [190 P. 804] [relying on former Civ. Code, § 230, predecessor to § 7611, subd. (d)].) Subdivision (c), dealing essentially with orphans or children whose fathers are not wed to their mothers and who do *not* receive them into their home, is not applicable in this case.

Additionally, Family Code section 7631 allows men who do not fall into one of the several categories of presumed fatherhood to have standing, but only if the mother consents to the adoption of the child.[10]

### B. *Evolution of the Federal Constitutional "Override" of State Laws Precluding Certain Natural Fathers From Being Recognized as Legal Fathers*

#### 1. *The "Early" Cases: Stanley and Lisa R.*

Beginning with *Stanley v. Illinois* (1972) 405 U.S. 645 [92 S.Ct. 1208, 31 L.Ed.2d 551] the United States Supreme Court injected federal constitutional law into the state law of paternity by establishing the idea that it was subject to limits under the due process clause of the Fourteenth Amendment to the Constitution. That is, the operation of certain substantive rules of state law might not be "constitutionally defensible." (See *id.* at p. 652 [92 S.Ct. at p. 1213].) In *Stanley*, a state statute *automatically* made the children of unwed

---

[8]Here is the text of section 7630, subdivision (a): "A child, the child's natural mother, or a man presumed to be the child's father under subdivision (a), (b) or (c) of Section 7611 [all of which concern a man who has married or attempted to marry the natural mother] [¶] (1) At any time for the purpose of declaring the existence of the father and child relationship presumed under subdivision (a), (b), or (c) of Section 7611. [¶] . . . only if the action is brought within a reasonable time after obtaining knowledge of relevant facts. After the presumption has been rebutted, paternity of the child by another man may be determined in the same action, if he has been made a party."

[9]Here is the text of section 7630, subdivision (b): "Any interested party may bring an action at any time for the purpose of determining the existence or nonexistence of the father and child relationship presumed under subdivision (d) of Section 7611."

[10]Here is the text of section 7631: "Except as to cases coming within Chapter 1 (commencing with Section 7540 [which is the conclusive presumption and the blood tests that are now part of that rule]) of Part 2, a man not a presumed father may bring an action for the purpose of declaring that he is the natural father of a child having a presumed father under section 7611, if the mother relinquishes for, consents to, or proposes to relinquish for or consent to, the adoption of the child. An action under this section shall be brought within 30 days after (1) the man is served as prescribed in Section 7666 with a notice that he is or could be the father of the child or (2) the birth of the child, whichever is later. The commencement of the action suspends a pending proceeding in connection with the adoption of the child until a judgment in the action is final."

fathers the wards of the court upon the death of the mother. Thus in *Stanley*, a man who had lived with the mother of his children for 18 years, but never married her, was separated from his children at the mother's death. In the opening lines of the opinion the *Stanley* court captured the mechanistic ruthlessness with which the Illinois statute operated: "When Joan Stanley died, Peter Stanley lost not only her but also his children." (*Id.* at p. 646 [92 S.Ct. at p. 1210].)

The Supreme Court would have none of it. It held that the due process clause "mandate[d]" that Peter Stanley be given a hearing to show his parental fitness. (405 U.S. at p. 657 [92 S.Ct. at p. 1216].)

Three years after *Stanley*, our own high court followed suit in *Lisa R., supra*, 13 Cal.3d 636. As in *Stanley*, *Lisa R.* involved underlying facts similar to those in the case before us—except in our case Brian actually lived longer with the child than the father in *Lisa R.*

In *Lisa R.*, a man lived with the natural mother both before the child's birth and afterwards for a period of four or five months and only lost contact when the natural mother returned to her husband. (See 13 Cal.3d at p. 649.) Taking a cue from *Stanley*, the court stated that due process *could* protect the interest of an unwed natural father against the operation of state statutes. (See *id.* at p. 648 ["In broad terms, *Stanley* states that the interest of an unwed father in his children is not only cognizable but also of sufficient substance to warrant deference except when the deprivation comports with equal protection and due process requirements"].)[11] In *Lisa R.*, the question was whether the man who claimed to be the natural father might have standing to establish paternity in a juvenile dependency proceeding.

Both the *Stanley* and *Lisa R.* opinions engaged in a classic weighing of the respective interests in the process of ruling that federal due process could limit the substantive state paternity law. In *Stanley*, the state interest in *assuming* that unwed fathers would not be good parents (it was "always

---

[11]Neither *Stanley* nor *Lisa R.* was any too fussy about the precise language in the federal Constitution from which springs the protectable constitutional right, though it seems clear from the context of both cases that the due process being referred to is the protection of liberty (as distinct from life or property). While the results in either case seem beyond peradventure, the inexactitude of the location in the constitutional text presents at least a couple problems. On a minor stylistic level, it often leads courts and attorneys to refer to children as "liberty interests." (Cf. *Guardianship of Simpson* (1998) 67 Cal.App.4th 914, 926, fn. 8 [79 Cal.Rptr.2d 389] [noting awkwardness of phrase].) More substantively, the attempt to locate the right in the liberty language of the due process clause led to some interesting doctrinal tensions coming to the fore (and which made a difference in the result) in the later case of *Michael H., supra*, 491 U.S. 110, 119 [109 S.Ct. 2333, 2340]. We explore the nuances of *Michael H.* anon.

cheaper and easier than individualized determination," noted the court) (405 U.S. at pp. 656-657 [92 S.Ct. at p. 1215]) was quite flimsy compared to the father's interest in retaining custody of his children ("cognizable and substantial," said the court) (*id.* at p. 652 [92 S.Ct. at p. 1213]).

*Lisa R.* presented a variation on the weighing of the interests, in that case whether the "competing private and state interests" would justify an absolute rule against the claimant being able to "submit evidence tending to establish parentage." (*Lisa R., supra,* 13 Cal.3d at p. 648 & fn. 14.) While the state's interest in the child's welfare was characterized by our high court as "not insignificant," it was still outweighed by the claimant's "private interest" which was based on "more than the mere biological fact that he is Lisa's natural father." (*Id.* at p. 649.) Rather, that private interest was rooted in the fact he had "resided with Lisa's mother both before and after Lisa's birth and contributed to her support." (*Ibid.*) Indeed, he had lived with the mother and the child "*as a family* for four or five months and was deprived of her custody only because Lisa's mother, over [his] wishes, elected to take Lisa with her when she returned to her husband." (*Ibid.,* italics added.)

And as to the matter of the mother's husband, the court noted that the state's interest in "promoting marriage, and in furtherance of that policy of not impugning a family unit" could not be served. (*Lisa R., supra,* 13 Cal.3d at p. 650.) It turned out that while the case was in the dependency system both the mother and her husband had died. (*Id.* at pp. 641-642.)

### 2. *The Emphasis on Relationships:*

### *Cornelious, Michelle W., and Melissa G.*

Two cases from the California Supreme Court in the mid-1980's added important glosses to the *Stanley-Lisa R.* idea that due process puts at least some limits on the operation of the conclusive presumption, though neither resulted in a win for the claimant. In *Estate of Cornelious* (1984) 35 Cal.3d 461 [198 Cal.Rptr. 543, 674 P.2d 245] a woman who claimed to be the decedent's daughter came forward in a probate proceeding seeking succession to the dead man's estate. Because she was the daughter of a woman married to another man, the conclusive presumption operated to prevent her from presenting proof of the decedent's paternity, so she argued that the conclusive presumption was an unconstitutional denial of due process. (*Id.* at p. 463.) Again the high court engaged in a balancing process, but this time the claimant lost because her "private interests" were not as weighty as the state's. Specifically, the claimant had no possibility of an "ongoing relationship" with her father (he was now dead) and had but "financial considerations." (*Id.* at p. 467.) These "equities [were] simply not in the same class

as those of the fathers in *Stanley* and *Lisa R*." (*Ibid.*) By contrast, the state's interests in promoting legitimacy were substantial. After all, the claimant's ostensible married father had a "familial relationship" with her and died thinking he was her father. (*Ibid.*)

The theme of relationship (as distinct from mere biological parenthood) was further developed in the second case, *Michelle W. v. Ronald W., supra*, 39 Cal.3d 354. In *Michelle W.*, a husband and wife were married for 12 years, during which time the wife had a long-standing affair with the claimant. A child was born nine years into the marriage; the claimant did not claim paternity at the time of her birth and provided no support for her. After the wife separated from the husband, gained custody of the child, and even got a child support order against the husband, the claimant married the wife. They then refused the now former husband visitation, and the claimant instituted a paternity action. Again, this time the claimant's interests were not weighty enough to counter the "social policies upholding the integrity of the family" which underlay application of the conclusive presumption. (*Id.* at p. 362.) The court noted that the claim was made in the face of the *husband's* "established and continuing emotional and financial father-daughter relationship." (*Ibid.*) The claimant's interest, by contrast, was an "abstract" one in establishing paternity. (*Ibid.*)

In the late 1980's, a Court of Appeal opinion, *Melissa G., supra*, 213 Cal.App.3d 1082, was the first state court opinion to confront the case of a married woman's erstwhile paramour actually developing a relationship with a child while her husband was still alive and himself willing to be a father to the child.

In *Melissa G.*, the child was born in August, eight days before the husband and wife separated. By December, the claimant and the child's mother were living together, and by the next August they were married. The husband never visited the child, and, just as the child was about to turn four years old, dependency proceedings were initiated after the claimant was arrested, the mother was hospitalized, and the children were found living without adult supervision. (See 213 Cal.App.3d at p. 1084.) In dependency court proceedings both the claimant and the erstwhile husband sought determinations of paternity; the husband relying on the conclusive presumption while the claimant relied on blood tests.

Again, the fact of a relationship between the unwed father and the child made the difference. The *Melissa G.* court held that application of the conclusive presumption was unconstitutional under the circumstances of the case. The claimant was "the only father" the child had ever known; the

husband—now coming into the child's life several years after her birth—was a "stranger to her." (213 Cal.App.3d at p. 1089.) The absence of an "extant marital union" and the fact that the husband had no "ongoing, or any, relationship" with the child contrasted with the claimant's having lived with the child for almost four years to decidedly tip the balance of interests against application of the presumption. (*Id.* at pp. 1088-1089.)

### 3.  *Michael H.: an Intellectual Feast Limited to Its Own Facts*

A few months prior to the publication of *Melissa G.*, however, the United States Supreme Court had issued a remarkable set of opinions in *Michael H., supra,* 491 U.S. 110. *Michael H.* is a remarkable case for a number of reasons, not the least of which is that for a United States Supreme Court case it has almost no application beyond its peculiar facts, if only because the holding of Justice Scalia's lead plurality opinion was expressly repudiated by a majority of five of the court's justices.[12] And that holding was itself rather narrow: An unwed father *in the position of the claimant in that case*[13] did not have a "liberty" interest protected by the federal constitution's due process clause because his interest was not one "traditionally protected by our society." (*Id.* at p. 122 [109 S.Ct. at p. 2341].) As Justice Brennan's dissent pointed out, however, five of the nine justices on the court expressly refused to sign off on that proposition. (See *id.* at p. 136 [109 S.Ct. at p. 2349 (dis. opn. of Brennan, J.); see also *Melissa G., supra,* 213 Cal.App.3d at p. 1088 [noting same thing].)

---

[12]The case is further remarkable for having no less than five separate opinions, and a lead opinion which, in its entirety, commanded the assent of only two justices, Justice Scalia and Chief Justice Rehnquist. Justices O'Connor and Kennedy signed the lead opinion, but wrote separately as well to distance themselves from footnote 6, which was a disquisition on the role of tradition in constitutional jurisprudence. Justice Stevens, in an enigmatic lone concurring opinion (discussed ahead), provided the fifth vote that made Justice Scalia's plurality opinion the lead one. Justice Brennan's dissent was joined in by Justices Marshall and Blackmun, and Justice White wrote his own dissenting opinion, joined in by Justice Brennan. As then judge and now California Court of Appeal Justice William Bedsworth once wrote about the similarly disjointed United States Supreme Court decision in *Arizona v. Fulminante* (1991) 499 U.S. 279 [111 S.Ct. 1246, 113 L.Ed.2d 302], "[t]his isn't an opinion, it's a Chinese menu. 'Choose one from column A. two from column B. With 4 you get a plurality.' " (Bedsworth, What I Saw and Heard (1994) p. 94.)

That said, the case is an intellectual feast of jurisprudence, in which fundamentally different approaches to the federal constitution spar with each other in the form of Justice Scalia's lead opinion and Justice Brennan's dissenting opinion. For example, no less than six of the seven footnotes in the lead opinion are devoted to taking issue with points raised in Justice Brennan's dissent. (See *Michael H., supra,* 110 U.S. at pp. 121-130, fns. 2-7 [109 S.Ct. at pp. 2341-2345].) The case could easily be the springboard for a seminar in jurisprudence, a law school class in legal analysis, or even a graduate course in political science.

[13]Justice Scalia's lead opinion by its own terms limited itself to the facts of the case before the court. (See *Michael H., supra,* 491 U.S. at p. 129, fn. 7 [109 S.Ct. at p. 2345].)

The facts in *Michael H.* were, indeed, as noted in the lead opinion, "extraordinary,"—somewhat more extraordinary, we might add, than the relatively more prosaic wife-has-affair, wife-gives-birth scenarios characteristic of such cases as *McNamara, Michelle W., Melissa G.* and the case before us now. The facts in *Michael H.* were perfectly suited to a gossipy tabloid newspaper or news program focusing on the beautiful people of what used to the be called the "jet set."

In *Michael H.* the wife and mother was an "international model," the husband a "top executive in a French oil company" and the paramour a neighbor whose primary business interests were based in the Caribbean. After the wife's affair with the neighbor, the child was born into an "extant marriage," and lived with the husband and the wife for five months. Then they separated and the husband headed off to New York. A few months later the wife "visited" the paramour in the Caribbean for about two months, then the wife went back to California to live with yet another man, then she "spent time" with her husband in New York, then she returned to the other man in California. The paramour then instituted litigation to establish his paternity and gain a right of visitation. While the litigation was pending, the wife again returned to live with her husband in New York for about four months, then returned to California, this time to let the paramour live with her in her apartment for about eight months, during which time he held out the child as his own and gained a stipulation in the litigation that he was the child's natural father. But before the stipulation was filed, the wife instructed her attorneys not to file it and then reconciled with her husband in New York, where it appears she settled down at least long enough for the case to work its way to the United States Supreme Court. (See *Michael H., supra,* 491 U.S. at pp. 113-115 [109 S.Ct. at pp. 2337-2338].) No wonder the *Michael H.* case was limited to its facts! If fickleness had a name it would be that of the wife in *Michael H.,* who flitted between, as the court put it, "a variety of quasi-family units" during the first three years of the child's life. (See *id.* at p. 114 [109 S.Ct. at p. 2337].)

Justice Scalia's lead opinion centered on the fact the child had been born into "an extant marital union" (see 491 U.S. at p. 128 [109 S.Ct. at p. 2345]; see also *id.* at p. 129 [109 S.Ct. at p. 2345] ["extant marital family"]) plus the fact that, after the wife's multiple tergiversations, she ended up with her husband and he wished to raise the child as his own. (See *id.* at p. 129 & fn. 7 [109 S.Ct. at p. 2345].) There being no tradition protecting (a) a paramour's interest in his child born in an "extant marital" union when, (b) the husband desired to raise the child as his own and, (c) the paramour had no parental relationship with the child, the claimant simply had no "liberty interest" for the due process clause to protect. The court characterized the

eight-month period during which the claimant had lived in the wife's apartment (during one of her orbits between New York, California and the Caribbean) as a time when "if he happened to be in Los Angeles, he stayed with her and her child." (*Id.* at p. 123, fn. 3 [109 S.Ct. at p. 2342].) The lead opinion, however, was willing to allow the possibility that there might be a "different conclusion with regard to adulterous fathering of a child whom the marital parents do not wish to raise as their own." (*Id.* at p. 129, fn. 7 [109 S.Ct. at p. 2345].)

The crucial fifth vote in *Michael H.* was provided by Justice Stevens. Basically, Justice Stevens rewrote the issue in the case to make it moot: He began by asking the question whether a state statutory scheme that prevented a man from "obtaining a judicial determination that he is [a child's] biological father—*even if no legal rights would be affected by that determination*" was "unconstitutional." (491 U.S. at p. 132 [109 S.Ct. at p. 2347] (conc. opn. of Stevens, J.), italics added.) Having framed the question that way—as if nothing hinged on the claimant's suit—Justice Stevens was able to answer it so as to allow himself to vote for the same result as Justice Scalia's lead opinion. In answer, he wrote, "I agree with Justice Scalia that the Federal Constitution imposes no obligation upon a State to 'declare facts unless *some legal consequence* hinges upon the requested declaration.'" (*Id.* at pp. 132-133 [109 S.Ct. at p. 2347], italics added.) The implication of these lines is that since nothing was really at stake in the case, it was hardly unconstitutional for California's statutes to preclude the claimant from obtaining an arid, consequence-less declaration of paternity.

Still, he confronted the reasoning of the lead opinion, and rejected it. "I . . . would not foreclose the possibility that a constitutionally protected relationship between natural father and his child might exist *in a case like this.*" (491 U.S. at p. 133 [109 S.Ct. at p. 2347] (conc. opn. of Stevens, J.), italics added.) But then, as if to render his preliminary comments irrelevant, he plunged into the merits of the case as if it were not moot by *assuming* that the claimant *did* have a constitutional liberty interest at stake. "Indeed, I am willing to assume for the purpose of deciding this case that Michael's relationship with Victoria is strong enough to give him a constitutional right to try to convince a trial judge that Victoria's best interests would be served by granting him visitation rights." (*Ibid.*)

Having made the assumption, Justice Stevens (perhaps too cleverly) evaded the issue over which Justices Scalia and Brennan had crossed swords —did the claimant have the right to establish his *paternity*?—by treating the case as if it was simply a dispute over visitation privileges. He theorized that the claimant *was* allowed to seek visitation—if not as a father, as an

interested person under former Civil Code section 4601 (now Fam. Code, § 3100, subd. (a) ["In the discretion of the court, reasonable visitation rights may be granted to any other person [other than a parent] having an interest in the welfare of the child"]). After noting that the trial judge "separately considered the effect of § 4601," he concluded that the claimant had indeed been "given a fair opportunity" not only to show that he was the child's natural father, and had developed a relationship with her, but that her best interests would have been served by a visitation order. (*Michael H., supra*, 491 U.S. at p. 135 [109 S.Ct. at p. 2348] (conc. opn. of Stevens, J.).) Because the trial judge thus had the "authority" to give the claimant visitation rights, and simply exercised his discretion not to give the "loving and harmonious home" that the wife had (at least by then) developed with her husband, the statutory scheme was "consistent" with the Fourteenth Amendment's due process clause. (*Id.* at p. 136 [109 S.Ct. at pp. 2348-2349].) Justice Stevens never came to grips with the problem that maybe the claimant in the case was necessarily seeking rights *in addition to* visitation.

For their part, Justices Brennan, Marshall, Blackmun and White squarely sided with the idea that a man in the claimant's position *did* have a liberty interest protected by the due process clause, and that application of the conclusive presumption even in the case of the claimant before the court was unconstitutional. (E.g., see 491 U.S. at p. 151 [109 S.Ct. at pp. 2356-2357] (dis. opn. of Brennan, J.) & p. 160 [109 S.Ct. at p. 2361] (dis. opn. of White, J.).)[14] Justice Brennan characterized Justice Stevens's position that the claimant could obtain visitation rights even as a nonparent as "mere wishful thinking," given the nature of such cases (if it goes to litigation, it is because the mother, i.e., the custodial parent, already objects to visitation by the natural father). (See *id.* at p. 149 [109 S.Ct. at p. 2356] (dis. opn. of Brennan, J.).)

### 4. *Reemphasis on the Parent-child Relationship: Dawn D., Rodney F., and Karen M.*

Our state Supreme Court's most recent case in this eddy of the law is *Dawn D. v. Superior Court* (1998) 17 Cal.4th 932 [72 Cal.Rptr.2d 871, 952 P.2d 1139] (*Dawn D.*), a case which while, like *Cornelious* and *Michelle W.*, ultimately went against the claimant, still recognized the viability of due process as a kind of constitutional "override" of the state statutes absolutely

---

[14]Why Justice White wrote separately from Justice Brennan is a matter of conjecture, since as to the case before the court he made essentially the same point as Justice Brennan (which may be why Justice Brennan also signed Justice White's dissent as well). Our guess is that he did not necessarily want to be drawn into the jurisprudential sparring on the general subject of the role of history and tradition in constitutional analysis which takes up considerable portions of Justice Scalia's lead and Justice Brennan's dissenting opinion.

precluding natural fathers from establishing paternity when they have a sufficient relationship with their children.

In *Dawn D.*, a married woman separated from her husband for about a three-month period, during which she began living with the claimant and became pregnant by him. (See *Dawn D., supra*, 17 Cal.4th at p. 936.) But then she moved *back* to her husband, and was living with him at the time she gave birth. (*Ibid.*) About six months into the pregnancy the claimant filed an action seeking to establish a parental relationship in the as-yet-unborn child, but after the birth the wife sought a judgment on the pleadings based on the conclusive presumption. After the trial court denied the motion, the wife sought a writ, denied by the intermediate appellate court but ultimately granted by our state Supreme Court.

*Dawn D.* is, however, significant for what it did not say as much as what it did. At the outset the court addressed the mother's "forceful[]" argument that case-by-case due process balancing ran "the risk of merely substituting [a] court's policy choices for those of the Legislature." (*Dawn D., supra*, 17 Cal.4th at p. 939.) In essence, the wife in *Dawn D.* was inviting our high court to overrule *Lisa R.* (See *Dawn D., supra*, 17 Cal.4th at pp. 938-939 [quotation from *Lisa R.* used to describe due process balancing].)

Significantly, the *Dawn D.* court declined the invitation to overrule *Lisa R.*, noting that courts can hold in check the "tension" between the legislative policy and those who claim it was unconstitutional in a given instance by the classic means of presuming constitutional validity and resolving doubts in favor of the statute. (See *Dawn D., supra*, 17 Cal.4th at p. 939.) Writing for the court majority, Justice Werdegar quoted language from *Lisa R.* emphasizing that whether due process would be offended in parentage cases would depend " 'on circumstances prevailing in each particular case.' " (*Dawn D., supra*, 17 Cal.4th at p. 938, quoting *Lisa R., supra*, 13 Cal.3d at p. 651, fn. 17.)

That said, the claimant in *Dawn D.* lost because he had no statutory standing to bring the action, and had no *relationship* on which to predicate a due process claim. He had only an "alleged biological link" (see *Dawn D., supra*, 17 Cal.4th at p. 942) in a context in which the child *was* "born into the marital family" (see *id.* at p. 942, fn. 6). The *Dawn D.* majority pointed to the important "distinction"—also present in *Michael H.*—"between an unwed father's . . . *existing* parent-child relationship and the claim, rejected by at least seven justices [of the *Michael H.* court] that an unwed father's biological connection alone to a child born to a married woman gives rise to a protected liberty interest in establishing a relationship with the child." (*Id.* at p. 942.)

Justice Kennard's concurring opinion also emphasized the lack of an "actual personal relationship." (17 Cal.4th at p. 945 (conc. opn. of Kennard, J.) ["Here, there is no support in history or our legal tradition for Jerry's claim that a biological father without any *actual personal relationship* with his child born to a woman married to another man has a fundamental right to *establish* a relationship with the child." (Italics added.)])

And, in fact, the distinction between a claimant's existing relationship and the *opportunity* to establish one was a key point of disagreement between the *Dawn D.* majority and the dissenters. (See 17 Cal.4th at p. 948 (dis. opn. of Chin, J.) ["[A] biological father who promptly comes forward to assume his parental responsibilities has a constitutional liberty interest in the *opportunity* to develop a relationship with his child, which the state may not extinguish without due process of law."])

Two 1990's Court of Appeal decisions also bear mentioning here as exemplary of *Dawn D.*'s essential distinction between an existing relationship and merely the opportunity for one. *Susan H. v. Jack S.* (1994) 30 Cal.App.4th 1435 [37 Cal.Rptr.2d 120] involved an alleged natural father who did not want to pay child support, and developed no relationship with a child who was both conceived and born during a period of marital cohabitation. In upholding application of the conclusive presumption the court noted "the absence of any relationship whatsoever" and the alleged natural father's "lack of interest in creating one." (*Id.* at p. 1441.)

*Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233 [71 Cal.Rptr.2d 399] also involved a child conceived and born during marital cohabitation and a natural father who had no relationship with the child. The wife and her husband were "the only parents the child [had] ever known." (*Id.* at p. 240.) Adumbrating the theme of *Dawn D.*, the court stated "[t]here is an obvious distinction between a biological father who has actually established a parent and child relationship, and a man who has not established such a relationship but would like to do so." (*Id.* at p. 239.)

### C. Brian Here Has a Constitutionally Protected Interest in the Existing Relationship He Established With Kennedy

The present case is a closer one than *Stanley*, *Lisa R.* or *Melissa G.*, all of which recognized a constitutionally protected liberty interest, because in each of those cases the husband of the wife was either nonexistent or not a potential factor in the constitutional calculus. There was no husband in *Stanley*; in *Lisa R.*, the husband was dead; in *Melissa G.* he never established a relationship. Here, by contrast, Ginger's husband, William, like Brian, is

presumably willing to accept the rights and responsibilities of being the legal father of Kennedy (including what might be some substantial child support obligations; see Fam. Code, § 4055).[15] On that point this case is more like *Michael H.* than either *Lisa R.* or *Melissa G.*, where the wife finally returned to her husband.

Even so, the husband's willingness to accept the wife back would be an exceedingly weak reed on which to support the idea that the conclusive presumption is constitutional here. In significant contrast to *Michael H.*, Kennedy was *not* "born into" an "extant marital family." At the time Kennedy was born Ginger had left William, and there is nothing to indicate that—in contrast with the facts in *Michael H.*—Brian just "happened" to be staying with her. (Cf. *Michael H., supra*, 491 U.S. at p. 123, fn. 3 [109 S.Ct. at p. 2342].) Rather, as the family photographs which have made it into the record show, Ginger, Brian and Kennedy *were* the only "family" known by Kennedy for the first year of her life. During that time *William* did not step forward to assert paternity by virtue of the conclusive presumption; his interest is a belated one, coincident with accepting Ginger back.

Moreover, given the lengthy time period between Kennedy's birth and Ginger's return to him, the fact that William is *now*—as this litigation progresses—willing to accept legal responsibility for Kennedy[16] is more a fortuity deriving from the timing of the litigation. What if, for example, Brian had more money and prescience and had filed this action within the first year of Kennedy's life ·when Ginger would have been his ally rather than adversary? The case would likely have gone by way of default.

Under such circumstances, the state's traditional interest in "upholding the integrity of the family" (cf. *Michelle W. v. Ronald W., supra*, 39 Cal.3d at p. 362) on which the conclusive presumption is founded becomes relatively weaker. There is no question, for example, that Ginger's leaving William for Brian in March 1995 would have established a firm date of separation for purposes of California's community property laws had they gone on to dissolve their marriage. More to the point, it cannot be reasonably contended

---

[15]A declaration of paternity, contrary to the implication of Justice Stevens in his concurrence in *Michael H.*, entails considerably more than mere visitation rights. There are things such as the control of the services and earnings of the minor (see Fam. Code, §§ 7500, 7503), as well as the responsibilities of child support (e.g., Fam. Code, § 4055). Also, an unwed father of a child by a woman married to another man might very well want to be declared the legal father so as to have the opportunity to have primary physical custody of the child should it ever appear in the child's interest, particularly if the mother divorced her husband or became unfit.

[16]Actually, this is an assumption we make; William is not a party to this action (though he testified on Ginger's behalf on the questions of cohabitation and fertility).

that Ginger and William were substantively a "marital union" at the point of Kennedy's birth and the first year of Kennedy's life. Ginger had left William not only to live with another man, but essentially to set up housekeeping with him in an arrangement that, but for the absence of her divorce and a remarriage to Brian, resembled the traditional nuclear family. There is, in this record, nothing to suggest that it was intended to be temporary.

And as for any state interest there is in substantively *reconstituting* a marital union, the fact that Brian already established a parent-child relationship undercuts even that. For example, surely the state's interest in cases like this one, but where the mother does *not* return to her husband, is in establishing paternity in the *unwed* father, so that the child has support and care from at least one man and the state is not burdened with the child's care if the mother dies. (Cf. *Leslie B., supra,* 14 Cal.App.4th at p. 981.) Making the natural father's paternity dependent on the mother's *belated* unilateral decision to return to her husband after the natural father has established a parent-child relationship not only creates uncertainty as to just what man *does* have the responsibility for the child (even here it is not totally clear that William wants to assume *legal* responsibility for Kennedy; we simply presume so) but creates perverse disincentives for men in Brian's position not to come forward to assume responsibility for the children they sire.[17] Indeed, if William did not want to assume legal responsibility, the interest of the taxpayers *qua* taxpayers would be entirely with Brian—a man who *is* now on record as being willing to pay child support for Kennedy.

Against the weakened state interest in the marital union in such cases (cf. *Melissa G., supra,* 213 Cal.App.3d 1082 [because husband had no relationship with child, state's interest was absent]), the present case—more so certainly than *Lisa R.*—presents a strong private interest in continuing an *existing* parent-child relationship based on a substantial period of time elapsing between the child's birth and the mother's return to her husband. Unlike *Michael H.*—where the child was born into an extant marital union and the claimant's eight months with the child were really more the result of happenstance than a concerted effort to establish a parent-child relationship—here there was no birth "into" a marriage and there was a deliberate coming forward on the part of the unwed father to assume parental responsibilities. And unlike *Dawn D.*, there is no question that the claimant has an *existing* parent-child relationship.

Given that the facts before us are closer to *Lisa R.* and *Melissa G.* than to *Michael H.* or *Dawn D.* (or *Cornelious* or *Michelle W.*, for that matter), it is

---

[17]In *Michael M. v. Giovanna F.* (1992) 5 Cal.App.4th 1272 [7 Cal.Rptr.2d 460], a *non*-conclusive presumption case (the baby was conceived before the marriage to another man) the court also observed that there was a lessened state interest in "preserving family integrity" because the situation was analogous to a divorce case where the custodial parent remarries, a "common situation [that] offends no public policy which would protect the second marriage from interference by the divorced parent." (*Id.* at p. 1284.)

clear that Brian's interest is one that cannot constitutionally be cut off by application of the conclusive presumption. It was therefore error for the trial judge to grant Ginger's summary judgment motion based on the facts of cohabitation and possible fertility.

### D. *Brian Has Standing*

■ Finally, we must consider the question of whether Brian has *statutory* standing. As we have already seen, Family Code section 7611, subdivision (d) clearly affords the possibility of presumed father status to a man who receives a child into his home and holds the child out as his natural child. Ginger counters with this argument: Without citation to authority she asserts that "California law only allows a child to have one presumed father." She then argues that because her husband, William, comes within two rebuttable presumptions set forth in section 7611, he must be *the* "presumed father." Brian, she argues, cannot be a "presumed father," and therefore he has no standing to bring this paternity action in the first place. Ginger's brief never quite confronts Brian's claim to presumed parenthood under section 7611, subdivision (d) except to quote a passage from a footnote in *Dawn D.* which, as we explain below, is directed at another problem (notice).

As noted above, Family Code section 7611 is structured as a series of tests or criteria, any *one* of which can afford a basis to adjudge a man the presumed *natural father* of a child. To briefly mention them:

—the operation of the conclusive presumption (§ 7611, first par.);

—a voluntary declaration of paternity when the mother is unmarried (§ 7611, first par.);

—the traditional rebuttable presumption when a child is born during a marriage, or a certain time thereafter (§ 7611, subd. (a));

—an unsuccessful attempt by an unwed father to enter into a valid marriage with the mother (see § 7611, subds. (b) & (c)); and, perhaps most important here,

—receiving a child into one's home and acknowledging him as one's natural child (§ 7611, subd. (d)).

Because more than one man may fit within the criteria of presumed fatherhood in Family Code section 7611, a specific statute, section 7612, subdivision (b), addresses that contingency. Under section 7612, subdivision

(b), the trial court must actually weigh the competing presumptions and resolve which weighs heavier in the balance. The text of the statute is: "If two or more presumptions arise under Section 7611 which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls." (*Ibid.*)

The implication of the very fact that a court may be called upon to engage in a weighing process is that the claimant must *already* have standing to present to the court his side of the case. After all, how can a man who, like Brian, fits within subdivision (d) of Family Code section 7611, present the argument that his presumption is the one "founded on the weightier considerations of policy and logic" if he doesn't have *standing* at least to make that argument to a court?[18] Moreover, if the statute contemplates a *weighing* of "considerations of policy and logic," there is the possibility that the man who fits within subdivision (d) of section 7611 might actually *win* and ultimately be held to be the presumed father over a man who might fit within another subdivision. The ineluctable implication of section 7612, subdivision (b) is that a man who comes within section 7611, subdivision (d) has standing. But then, such a result makes sense when one considers the virtually ludicrous result that a man could fit within a statutory category of presumed fatherhood and still not have standing to establish paternity.

In the present case, both William and Brian meet one or more of the tests for presumed fatherhood under Family Code section 7611. William, Ginger's husband, comes within the criteria because Kennedy was born "during the marriage," (§ 7611, subd. (a)), even though at the time his wife was living with another man.[19] For his part, Brian clearly comes within the holding out presumption of subdivision (d), under circumstances which certainly lead a neutral observer to presume that he was the natural father of

---

[18]It would be highly anomalous for the statute to be read to say that a man who based his claim to presumed fatherhood under Family Code section 7611, subdivision (d) would have no standing as a *plaintiff* in a paternity suit, but could make his balancing argument pursuant to section 7612, subdivision (b) if he were brought in as a *defendant.* Not only would that make the man's ability to enforce a constitutionally protected relationship depend on a fortuity (the wife's or husband's inclination to seek a declaration of his nonpaternity), but would appear to treat equals (similarly situated unwed fathers) unequally in an irrational way. Without deciding that question, of course, it is still safe to say that statutes should not be interpreted in a way that gratuitously reaches out to create at least the *appearance* of irrationality.

[19]He might also come within the receiving and acknowledging provision of Family Code section 7611, subdivision (d) in his own right, because after Ginger went back to him, she took Kennedy with her and apparently since that time has been holding out Kennedy as *his* daughter. Whether the presumption really fits where the married woman leaves her husband and lives with another man during the birth of the child and for more than a year afterwards is something we need not decide in this appeal. Indeed, just as this case was about to be filed we received a request for judicial notice of the fact that Ginger had filed a petition for

the child. Brian was present at Kennedy's birth, he is listed on the birth certificate, he received Kennedy into his home immediately after her birth, and he is the one whom *Ginger* represented to the world immediately after the birth as the father of her child. Most important of all, in this case the receiving and acknowledging presumption is the product of one year's living with the child followed up with visitation after the relationship with the mother ended.

Under the plain language of Family Code section 7630, subdivision (b) Brian has statutory standing. Because Brian is a presumed father under subdivision (d) of section 7611, subdivision (b)—no doubt about that—of section 7630 gives him standing. The language of the statute is: *"Any interested party may bring an action at any time* for the purpose of determining the existence or nonexistence of the father and child relationship *presumed under subdivision (d) of Section 7611."* (Italics added.) There is nothing in the text of section 7630 that limits the words "any interested party" to men who have been, at some point in the process, married to the mother.

As we explain below, footnote 5 (17 Cal.4th at p. 938) in *Dawn D.* does *not* conflict with the conclusion that a man in Brian's position has standing under Family Code section 7630, subdivision (b). We believe that footnote 5, which is clearly dicta in any event, is talking about something else.

However, even if Family Code section 7630 were ambiguous, and did not require Brian to have standing, there is a rule of statutory interpretation which would resolve the ambiguity in his favor: As the *Dawn D.* opinion makes clear, in interpreting statutes courts should resolve them in favor of constitutionality. (See *Dawn D., supra*, 17 Cal.4th at p. 939.)

As this opinion has taken some space to demonstrate, a conclusion that the statutory conclusive presumption (Fam. Code, § 7540) automatically cuts off a man in Brian's position from asserting paternity is unconstitutional. In the case of the conclusive presumption, we do not have the option of choosing an interpretation that can save it from such a result. But it also follows from what *Kusior, Vincent B., Marriage of B.,* and *Michael H.* all said about the substantive nature of the conclusive presumption, and from the very way *Dawn D.* treated statutory standing, that statutory standing rules, like the conclusive presumption, may be unconstitutional as applied. Indeed, the

dissolution of her marriage to William. We grant that notice, needing merely to note now that the impact, if any, of the dissolution may be considered in further proceedings.

question of whether the statutory standing rules were unconstitutional as applied to the claimant in *Dawn D.* was the whole focus of that case. (In *Dawn D.*, the answer was no as it concerned the claimant there, who never developed a relationship with the child.) Fidelity to *Dawn D.*'s admonition to presume that statutes are constitutional and to resolve doubts in favor of their constitutionality also leads us to construe section 7630 as providing for standing for Brian.

For the moment, holding that Brian has statutory standing spares us the problem of the *outcome* of any weighing process pursuant to subdivision (b) of Family Code section 7612. And in all likelihood DNA tests on remand will probably render that problem moot.[20]

We must now address the enigmatic footnote 5 in *Dawn D.* (See *Dawn D., supra*, 17 Cal.4th at p. 938, fn. 5.)

The footnote is in any event clearly dicta, because it addresses a topic that was unnecessary for the court's decision—namely, what might have been some of the legal dynamics if the claimant in that case *had* "himself become a presumed father under subdivision (d) of section 7611 by receiving and acknowledging the child." There was no reason to address the question because the claimant in *Dawn D.* did not argue he had "statutory standing." (*Dawn D., supra*, 17 Cal.4th at p. 938 ["Jerry does not argue he has statutory standing to bring this action . . . ."].)

In the first paragraph of the footnote, the court observes that if the claimant had "become a presumed father under subdivision (d) of section 7611," (*Dawn D., supra*, 17 Cal.4th at p. 938, fn. 5) he still wouldn't have standing by virtue of *subdivision (a)* of Family Code section 7630. That observation was a simple truism, because receiving and acknowledging (§ 7611, subd. (d)) is not listed in subdivision (a) of the statute.

The court next says, in the second paragraph of the footnote, that even if the claimant could bring an action under subdivision (d) of Family Code section 7611 to establish the husband's nonpaternity, "[s]uch an action, however, whatever its outcome, would appear neither to affect [the husband's] status as a presumed father under subdivision (a) of section 7611 nor to confer on [the claimant] presumed father status." (*Dawn D., supra*, 17 Cal.4th at p. 938, fn 5.)

---

[20]DNA tests will certainly constitute clear and convincing evidence rebutting any of the presumptions that might favor either Brian or William. (Under subd. (a) of Fam. Code, § 7612, a presumption shown by § 7611 "may be rebutted . . . only by clear and convincing evidence.") Under section 7551, the court *may* order blood tests at *any* time on either its own motion or if suggested by any person involved in the case. (*Dawn D., supra*, 17 Cal.4th at p. 938, fn. 5.)

To the degree that the court was saying that the *husband's* status as a presumed father under Family Code section 7611, subdivision (a) would not be affected by the fact that a rival claimant might come within subdivision (d), the court was again stating a truism. We do not think, however, that the sentence should be read as even a suggestion by the high court that one *cannot* be a presumed father if one comes within subdivision (d) or that there can be "only one" presumed father under section 7611 *prior to the weighing process contemplated by section 7612, subdivision (b).* Of course there can be only one presumed father *after* that weighing process—that too is a natural inference to be drawn from section 7612—and our opinion today should not read to say otherwise.

Rather, the *Dawn D.* court appears to have been indicating that the claimant before it had a serious problem with *notice* to the husband. That is indicated by the citation which follows the sentence, a "see also" cite to Family Code section 7635, subdivision (b). In that citation the court paraphrased section 7635, subdivision (b) this way, to emphasize the importance of notice: "[I]n an action to determine the paternity of a presumed father, the mother, each presumed father, and any alleged natural father must receive notice and an opportunity to be heard, and may be made parties." (17 Cal.4th at p. 938.) The implication that we take from this passage is that the claimant in *Dawn D.* should have given notice to the husband of his suit.

Whether Brian's claim here may ultimately fail because of the same notice problem that dogged the claimant in *Dawn D.* is not something we must decide now, in this appeal from a summary judgment. The *Dawn D.* footnote was obviously not meant to be—and it certainly doesn't purport to be—a statement of definitive general guidance for lower courts as to how to interpret the interlinking statutory framework involving Family Code section 7611, subdivision (d), section 7630, subdivisions (a) and (b), section 7631, and section 7635, subdivision (a). (The operative verb in the *Dawn D.* footnote is "appear.") And in any event, an interpretation of section 7630 and *Dawn D.*'s footnote 5 that does *not* require us to conclude that section 7630 as applied here is unconstitutional is to be preferred to an interpretation that does force us to do so.

## IV. CONCLUSION

Granting the summary judgment in Ginger's favor based on just the facts of cohabitation at the time of conception and William's nonimpotency and nonsterility was error. The judgment is reversed. Because the reversal of a

summary judgment means that the case must necessarily be returned to the trial court for further proceedings, we decline to award costs on this appeal now. Those costs may, at the trial judge's discretion, be awarded at the conclusion of the proceeding.

Rylaarsdam, J., and Bedsworth, J., concurred.