[No. G031676. Fourth Dist., Div. Three. Sept. 5, 2003.]

Estate of LYNDELL CARTER, Deceased.
RICKY N. CARTER, as Administrator, etc., Petitioner and Appellant, v.
LINDELLA LASHON REGAN CARTER et al., Claimants and
Respondents.

[■■■■■■]

**COUNSEL**

Ricky N. Carter, in pro per., for Petitioner and Appellant.

Roy O. Moss, Jr., for Claimants and Respondents.

**OPINION**

**SILLS, P. J.—**

## I. INTRODUCTION

The trial court vacated an order for final distribution of an estate when two women came forward who *might* be "heirs" (here, the daughters) of the decedent, as "heir" is defined under the laws of intestate succession. The two women had not received notice of the administration of the intestate estate from the petitioner for administration, the brother of the decedent. The two women had been born out of wedlock, and the petitioner for administration had concluded that they did not qualify as heirs, and were therefore not entitled to personal notice under Probate Code section 8110. The statute provides in pertinent part: "At least 15 days before the hearing of a petition for administration of a decedent's estate, *the petitioner shall serve notice of the hearing by mail or personal delivery on* all of the following persons: [¶] (a) *Each heir of the decedent, so far as* known or *reasonably ascertainable by the petitioner.*" (Italics added.)

■ As we explain in detail below, though it was a close case, the trial court correctly set aside the final order of distribution. The moving papers

supporting the set aside motion contained evidence which showed that the petitioner had knowledge of facts from which a reasonable person could infer that the decedent had both (1) received the two claimants into his home and (2) openly held them out as his natural children. (See Fam. Code, § 7611, subd. (d).) ██ While the Probate Code clearly requires that heirship established on that basis be by clear and convincing evidence (see Prob. Code, § 6453, subd. (b)(2)), that determination must ultimately be made by a *court*, not a self-interested petitioner for administration who has an incentive to "find" against a potential and *rival* claimant. (Cf. *Tulsa Professional Collection Services, Inc. v. Pope* (1988) 485 U.S. 478 [99 L.Ed.2d 565, 108 S.Ct. 1340] (*Tulsa Collection*).) Any narrower interpretation would offend due process as explicated by the United States Supreme Court in *Tulsa Collection*. ██ That case constrains courts to give the phrase "reasonably ascertainable," as used in Probate Code section 8110, a broad meaning, sufficient to include individuals (1) whose identities are known to the petitioner and (2) who reasonably might be heirs. Only then can a *neutral* decision maker adjudicate the merits of their claim to heirship. Any other rule makes the petitioner for administration a judge in his or her own cause.

## II. Facts

### A. *Events Leading to the Set Aside Motion*

Lindella and Lenitra[1] are the daughters of Carman Regan. Their father is not listed on their birth certificates, and Carman was not married at the time of the conception or birth of either child. The circumstances by which they were led to ultimately bring a motion to set aside the final order of distribution of the estate of Lyndell Carter on the theory that they are his daughters are somewhat unusual. Those circumstances are centered in the fact that there was some confusion as to exactly who had title to the main asset in his estate, a certain house in Anaheim. Here are those circumstances:

In 1983, Lyndell bought the house in Anaheim. Carman and her daughters moved into it. Shortly after the purchase, Lyndell transferred title to his mother, Mildred. According to Lyndell's brother Ricky, the transfer was

---

[1] For the most part we will use first names only in this opinion. That is intended for reader convenience; no disrespect is intended. Also, since this is a case where paternity is at issue, the use of last names would substantively bias the statement of facts in favor of one party or the other. The two women claimants called themselves "Lindella Lashon Regan Carter" and "Lenitra Ambrell Regan Carter" in their set aside motion, but the petitioner and deceased's brother, Ricky N. Carter, claimed they were known only as "Lindella Regan" and "Lenitra Regan" and the addition of "Carter" was merely intended to lend credence to their claim in this litigation. Since in this opinion we do not address the *merits* of Lindella and Lenitra's claims as such, omitting last names is appropriate for that reason as well.

Lyndell's way of providing for his mother Mildred and simultaneously preventing Carman from ending up with the house. In 1987, Mildred transferred the house to her father and Lyndell's grandfather, Leazer. According to Ricky, Mildred was afraid she would have future "legal problems" and she wanted "to make sure" she wouldn't lose the house.

However, in 1988, unbeknownst to Ricky and Mildred, Leazer gave a deed to the property back to Lyndell. Lyndell died the next year. *He* never recorded that deed.

Ricky was incarcerated at the time of Lyndell's death in 1989, and his younger brother was about to be incarcerated, so, according to Ricky, Mildred allowed Carman to remain in the house if she would maintain it and pay the taxes. (The degree to which she had Leazer's authority to do this is unclear in this record.)

By 1991 grandfather Leazer was in failing health. Lyndell, to whom he first deeded the property, was now dead, so he deeded the property again, this time back to Mildred. However, Mildred never recorded that deed.

In 1999 Ricky got out of prison and was able to buy a roller skate shop from an owner about to retire. By the next year, according to Ricky's own account, Mildred was happy he had gone straight and wanted to give him the Anaheim property to help build up his roller skate business. So she sent him the unrecorded deed which Leazer had given her.

Then Ricky received a shock. The 1988 deed which Leazer had given the now-deceased Lyndell had been recorded, in September 2000, by the attorney who now represents Lindella and Lenitra. Ricky could not record the deed that Mildred had given him.

As soon as he discovered the recording of the deed, Ricky petitioned the probate court to administrate Lyndell's intestate estate. Concluding they were not his brother's heirs, he did not give personal notice to Lindella or Lenitra. Notice, however, was published in a local Anaheim newspaper. In May 2002 Ricky obtained a final order of distribution of the estate.

Three months later, on August 22, 2002, it was Carman's turn to be shocked. She telephoned the county tax assessor to make certain that its office had received a certain delinquent property tax payment. (She had been living in the house, as explained more fully below.) She then learned that there had been a change in ownership of the house from Lyndell to Ricky. Mildred had apparently received the house from the estate and then transferred it to Ricky. Carman contacted her lawyer and by September 27 he had, on behalf of

Lindella and Lenitra, filed a motion to set aside the order of final distribution. The motion was premised both on the discretionary relief provisions of Code of Civil Procedure section 473 and the general power of a court to set aside a judgment procured by extrinsic fraud.

### B. The Evidence Bearing on the Set Aside Motion

#### 1. The Moving Papers

The set aside motion was supported by the declarations of Carman, Lindella, and Lenitra. With regard to the claim that Lindella and Lenitra were Lyndell's natural children, the three declarations made these points:

—Lyndell and Carman grew up close together in North Carolina and began dating when Carman was 14 years old. At age 16 Carman became pregnant with Lindella (according to her, by Lyndell) and "[t]here was never any question in the minds of Lyndell and his family as to the fact that he was Lindella's and Lenitra's father."

—In 1976, Lyndell and Carman moved to Compton, where they lived with "their" daughter Lindella. They lived in a back house while Ricky and his father lived in the front house.

—In 1983, Lyndell, Carman, Lindella and Lenitra all began living together in the Anaheim house, where Lyndell resided until he died in 1989. Carman and Lenitra still reside there.

There is no statement in the moving papers about any *public* declarations which Lyndell might have made concerning his paternity of Lindella or Lenitra.

#### 2. The Opposition Papers

Ricky's opposition papers told a somewhat different story.

Lyndell left North Carolina for California when Carman became pregnant by another man. However, Carman followed him to California in 1976, where they lived together four or five months in the rear of Ricky's fathers' property. Ricky's father did not like Carman and insisted she move. For a while she lived in a cheap motel. Lyndell and Carman had an on-off "love/hate" relationship, and their "childhood romance" motivated Lyndell to make sure that Carman was "never destitute." When Carman became pregnant with Lenitra, Lyndell told his brother that Carman had engaged in multiple affairs with other men and Lenitra was not his child. They even

discussed the possibilities of who might have fathered Lenitra. Further, Carman had received welfare checks at a residence in Compton when, according to her declaration, she was supposedly living in the Anaheim house.

As to the Anaheim house, while Lyndell had allowed Carman to move into it, he "always maintained other residences where he lived more often and spent more time" than he did at the Anaheim house.

### C. *The Result of the Set Aside Motion*

The motion was granted because of the lack of notice. "The court finds," the minute order said, "that no notice was given to potential parties."

Ricky timely appealed from the formal set aside order. Neither the minute order nor the ultimate final order mentions whether the court was acting pursuant to section 473 of the Code of Civil Procedure or the general doctrine of extrinsic fraud.

## III.   DISCUSSION

### A. *The Problem: The Petitioner Is a Judge in His or Her Own Cause*

■   This case brings into sharp focus a problem in probate estate administration that did not exist in California prior to *Tulsa Collection, supra,* 485 U.S. 478. In *Tulsa Collection*, the United States Supreme Court held that creditors of estates—when they were "known" or, more significantly for our purposes here, "reasonably ascertainable"—were entitled to *personal* notice of estate proceedings, that is, by mail or personal service. (*Id.* at p. 491.) Mere notice by publication in a newspaper would not comport with due process.

In the wake of *Tulsa Collection*, California's Probate Code was revised, most notably Probate Code section 9050, which incorporated Tulsa Collection "reasonably ascertainable" standard for creditors.[2] Not just known, but reasonably ascertainable creditors were entitled to notice by mail or personal service as distinct from the back pages of the classifieds of local newspapers. (See *Clark v. Kerby* (1992) 4 Cal.App.4th 1505 [6 Cal.Rptr.2d 440] [prior

---

[2] Because this case involves a portion of the Probate Code which makes considerable reference to the laws governing the determination of paternity in the Family Code, all statutory references will be spelled out.

California statutory scheme held unconstitutional insofar as it deprived notice to creditor who might have been "reasonably ascertainable"].)

In the case before us, we are not concerned with reasonably ascertainable *creditors*, but with reasonably ascertainable *heirs* of an intestate estate. Even so, the same rule applies. Probate Code section 8110, which governs notice to heirs of an intestate estate, was, like Probate Code section 9050, revised in the wake of *Tulsa Collection* to adopt a reasonably ascertainable standard for notice. (See Prob. Code, § 8110 [quoted above].)[3]

The reasonable ascertainability of heirs can present a particularly acute problem in cases of children born out-of-wedlock where the decedent is male. (See generally Buttorff, *Illegitimate Children's Right to Receive Notice in Probate Proceedings Involving Putative Father's Estate* (1992) 31 U. Louisville J. Fam. L. 649.) The problem is that the petitioner himself or herself ends up deciding whether the claimant meets the legal criteria without any neat categorical lines.

Of course, there are plenty of bright lines in the law, and when they apply, there is no difficulty in ascertaining heirs, even for a self-interested petitioner for administration of an estate. For example, a voluntary, signed written declaration of paternity will certainly establish heirship. (Fam. Code, § 7571.) So will a court order in a formal paternity action, even in a foreign jurisdiction. (See Prob. Code, § 6453, subd. (b)(1); e.g., *Estate of Griswold* (2001) 25 Cal.4th 904 [108 Cal.Rptr.2d 165, 24 P.3d 1191] [stipulation in Ohio " 'bastardy proceeding' " that man was the father of the deceased held to be sufficient to "acknowledge" child].) Likewise will a determination of a parent-child relationship in a divorce judgment. (See *Weir v. Ferreira* (1997) 59 Cal.App.4th 1509, 1515–1516 [70 Cal.Rptr.2d 33].)

There are also bright lines which categorically rule out heirship. For example, there will be cases where a claimant must be conclusively presumed

---

[3] The correspondence between Probate Code sections 8110 and 9050 is not surprising given the roughly similar positions in which creditors and heirs both find themselves after a decedent's death. Both may lose what they are otherwise entitled to if they do not receive notice of estate proceedings. Not too long after *Tulsa Collection* came down, the Iowa Supreme Court explicitly extended the rationale of *Tulsa Collection* to heirs (see *Estate of Weidman* (Iowa 1991) 476 N.W.2d 357, 361), and other commentators have also noted that there is no reason to treat heirs differently from creditors in the notice context. (See Gramza, *Due Process Requires Actual Notice to Known or Reasonably Ascertainable Estate Creditors: Tulsa Professional Collection Servs. v. Pope, 485 U.S. 478 [99 L. Ed. 2d 565, 108 S. Ct. 1340]* (1989) 58 U. Cin. L.Rev. 303, 321 ["Logically, if due process requires actual notice to known or reasonably ascertainable creditors of the estate, it follows that beneficiaries and those who have standing to contest the will must also receive actual notice. After all, both creditors and beneficiaries have property interests that would be adversely affected by a probate proceeding."].) Unlike Iowa, California courts have been spared the need to extrapolate *Tulsa Collection* from creditors to heirs, because the Legislature has already done it.

to be someone else's child because he or she was conceived by a wife at a time when she was cohabiting with her husband. (E.g., *Estate of Cornelious* (1984) 35 Cal.3d 461 [198 Cal.Rptr. 543, 674 P.2d 245] [because claimant was conclusively presumed to be daughter of man married to her mother, she could not be child of mother's paramour, who was the deceased].) In other cases, the known familial relationship of a potential claimant to the deceased "clearly" makes that person not an heir under the laws of intestate succession. (E.g., *Estate of Baird* (1987) 196 Cal.App.3d 957, 961–962 [242 Cal.Rptr. 246] [widow not required to give notice to three half-sisters who "clearly" were "not heirs"].)[4]

But we are dealing here with the harder case where the petitioner has no definitive categorical criteria to determine who is eligible for personal notice under Probate Code section 8110. ■ Under California law, a child born out of wedlock is the decedent's heir even if there has been no *formal* declaration or judgment of paternity in the decedent's lifetime, if the decedent received a child into his home and held the child out as his natural child. (Fam. Code, § 7611, subd. (d).) Probate Code section 6453, which is part of the laws of intestate succession, adds the requirement that when the relation-ship is established that way, the evidence of holding out must be "clear and convincing."[5]

In such a case, some sort of adjudicatory process must be performed by someone, and by its terms the Probate Code contemplates that it will be performed, at least initially, by the petitioner for administration of the estate. There is no other way to read Probate Code section 8110, which by its

---

[4] *Absolute* certainty in matters of paternity, of course, has historically been unobtainable. Think of the characters in classical mythology who discover who their true father was somewhat late in their lives. E.g., Theseus, Arthur, Luke Skywalker. Generally, however, old-fashioned common sense has worked most of the time. It is a common joke in law school evidence classes that the question, "How old are you?" or "What is your birthday?" are, technically, objectionable as calling for hearsay. No one is born looking at a digital watch. The same may be said for "Who are your parents?" The law, therefore, quite sensibly, allows family history to be proved by hearsay. (See generally 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 275, pp. 991–992.) If people talk and act as if so-and-so were so-and-so's child, the law can recognize that fact. So can most estate administrators.

[5] Since Probate Code section 6453 figures in our analysis later, we quote it in full now: "(a) A natural parent and child relationship is established where that relationship is presumed and not rebutted pursuant to the Uniform Parentage Act, Part 3 (commencing with Section 7600) of Division 12 of the Family Code. [¶] (b) A natural parent and child relationship may be established pursuant to any other provisions of the Uniform Parentage Act, except that the relationship may not be established by an action under subdivision (c) of Section 7630 of the Family Code unless any of the following conditions exist: [¶] (1) A court order was entered during the father's lifetime declaring paternity. [¶] (2) Paternity is established by clear and convincing evidence that the father has openly held out the child as his own. [¶] (3) It was impossible for the father to hold out the child as his own and paternity is established by clear and convincing evidence."

operation places the burden on the petitioner to send personal notice to "known" and "reasonably ascertainable" heirs.

The rub, as we have alluded to above, is that petitioner for administration is himself or herself likely to be related to the intestate decedent and, as the *Tulsa Collection* court noted in the context of creditors, will probably have a distinct *dis*incentive to give notice to a party whose claim may preempt or diminish his or her own. (See *Tulsa Collection, supra*, 485 U.S. at p. 489 ["Moreover, the executor or executrix will often be, as is the case here, a party with a beneficial interest in the estate. This could diminish an executor's or executrix's inclination to call attention to the potential expiration of a creditor's claim."]; accord, *Estate of McGuigan* (2000) 83 Cal.App.4th 639, 651 [99 Cal.Rptr.2d 887] [noting as regard Prob. Code § 1355 petitions to recover escheated property, "there is a strong economic incentive to limit the information in the section 1355 petition so as to enhance the prospect that the petitioner will be the one to receive the escheated estate"].) The net result is that the petitioner for administration of the estate is likely going to be required to be a judge in his or her own cause. Or, to carry the judicial metaphor further, the petitioner has a direct financial incentive to "find" that a potential rival for the estate is not a "reasonably ascertainable" heir.

Interestingly enough, the very first use of the phrase, "no man should be a judge in his own cause," in a reported California decision was in a probate case where our Supreme Court observed that an estate administrator who *might* have had an equitable interest in a judgment against the estate—though the judgment was ostensibly owned by his brother—acted correctly in submitting the judgment as a claim against the estate to the probate court, and not just deciding that he had the unilateral right, as executor, to collect on it for himself. (See *Estate of Crosby* (1880) 55 Cal. 574, 578 ["If E. P. Reed, the administrator, had an equitable interest in the judgment, the propriety of its presentation to the Probate Judge, and not to him, is manifest. No man should be a judge in his own cause."].)

B. *The Solution: Notice to All Potential Claimants Whose Existence and Identities Are Known*

As a practical matter most of the time, the problem that would-be administrators of intestate estates must determine who gets notice is a manageable one, despite whatever self-interest a petitioner for administration may have. That is, most of the time there is no dispute about who are a decedent's natural children.[6] Hence it is already established that if the

---

[6] Probate Code section 8110 specifies that an "heir of the decedent" is entitled to personal notice, Probate Code section 6450 states that a "relationship of parent and child" exists for a

petitioner fails to give notice to a genuinely *known* heir, he or she commits extrinsic fraud and the heir may maintain an action in equity for a constructive trust later. (See *Stevens v. Torregano* (1961) 192 Cal.App.2d 105 [13 Cal.Rptr. 604] [dicta that if "the executor or administrator knows of an heir, and withholds that information from the court, his doing so is extrinsic fraud, justifying a suit in equity by that heir to impose a constructive trust."]; accord *Estate of McGuigan, supra,* 83 Cal.App.4th 639 [failure to list known and closer heir in petition to recover escheated property held to be extrinsic fraud]; *Harkins v. Fielder* (1957) 150 Cal.App.2d 528 [310 P.2d 423] [extrinsic fraud where brother of deceased concealed existence of known surviving brother and sister]; *Purinton v. Dyson* (1937) 8 Cal.2d 322 [65 P.2d 777] [extrinsic fraud where executor of will concealed the existence of woman whom he knew to be deceased's granddaughter]; *Monk v. Morgan* (1920) 49 Cal.App. 154 [192 P. 1042] [extrinsic fraud where administrator sent check to rival claimant to induce claimant that deceased was still alive]; cf. *Estate of Poder* (1969) 274 Cal.App.2d 786 [79 Cal.Rptr. 484] [notice to known heirs in Estonia held invalid where notice sent to a lawyer in San Francisco representing nephew and proponent of holographic will because there was not even some slight prospect of actual delivery to the addressees].)

By the same token, in cases where the *identity and existence* of a *potential* heir is unknown, the law is also clear that the petitioner need not give notice —though that rule is pretty obvious if one thinks about it. (E.g., *Lynch v. Rooney* (1896) 112 Cal. 279 [44 P. 565] [daughter of sister of intestate decedent mistakenly thought in good faith that decedent's brother in Ireland was already dead].) The case which Ricky primarily relies on here, *Parage v. Couedel* (1997) 60 Cal.App.4th 1037 [70 Cal.Rptr.2d 671], is clear on that precise point. In *Parage,* a petitioner seeking to recover escheated property was wholly unaware of even the existence of two French citizens, cousin and a first cousin once removed of the decedent, who had heirship claims superior to his until they filed a motion for relief. So he obviously had no duty to arrange personal notice for them. (See *id.* at p. 1043.)

---

person and a person's "natural parents," and Probate Code section 6453 says that a natural parent and child relationship "is established" by reference to the Uniform Parentage Act set forth in the Family Code, commencing with section 7600. The Uniform Parentage Act, in turn, incorporates Family Code section 7540 by reference (see Fam. Code, § 7611, first par.), and Family Code section 7540 says that a child born to a woman who was cohabiting with her husband (at the time of conception—a judicial gloss the courts have added, see *Brian C. v. Ginger K.* (2000) 77 Cal.App.4th 1198, 1203, fn. 3 [92 Cal.Rptr.2d 294]) is conclusively presumed to be a child of the marriage. Furthermore, Family Code section 7611, subdivision (a) makes any child who is born during a marriage or within 300 days of termination of the marriage to be rebuttably presumed to be a child of the marriage. Those sections, in addition to cases of voluntary paternity declarations and court orders adjudicating paternity, will cover most people most of the time.

*Parage*, however, is of no help to Ricky in the case before us because we are dealing with potential heirs whose identity and existence *were* clearly known to him. For the same reason, authority which can be read for the proposition that administrators have no affirmative duty to notify heirs whose *existence* is only *suspected* but whose *specific identities* are not known cannot help him either. (See *Mulcahey v. Dow* (1900) 131 Cal. 73 [63 P. 158]; *Hewett v. Linstead* (1942) 49 Cal.App.2d 607 [122 P.2d 352].) Under *Mulcahey* and *Hewett*, if all the petitioner knows is that there is someone out there somewhere who might be the decedent's heir, there is no need to undertake the burden of searching out that person's identity.[7]

Ricky has also taken some refuge in the lack of *formal* recognition by court order during his brother's lifetime. Ricky explained to the trial court

---

[7] The statement of facts in *Mulcahey* is abbreviated, rather what you might expect in a *per curiam* opinion. The totality of the facts was this: "There is some general evidence tending in an unsatisfactory way to show that [the widow] knew of the existence of these plaintiffs [the deceased's out-of-state sister and two of her children] several years prior to the death of her husband." (See *Mulcahey v. Dow, supra,* 131 Cal. at p. 78.)

In *Hewett*, the administrator caught a brief glimpse in 1912 of a woman who might have been the decedent's wife and was held by the trial court to have been guilty of extrinsic fraud in 1932 for having failed to remember the presence of the woman, inquire as to whether she was the decedent's wife and whether he had any children by her. The appellate court squarely rejected that idea: "To so hold would be in effect to rule that an administratrix is under a positive duty at her peril to discover the existence of possible heirs of whose existence she had no reasonable grounds to suspect." (*Hewett, supra,* 49 Cal.App.2d. at p. 617.)

*Mulcahey* and *Hewett* present a distinct contrast to a Louisiana case which went the other way. In *Succession of Hearn* (La.Ct.App. 1982) 412 So.2d 692, the deceased was forced into a shotgun wedding in 1919 and a child was born to his first wife while married to him. The deceased and his first wife separated the next year and were divorced about three years later. In the 1930's the deceased married his second wife, and she lived with him until his death in the 1970's. The deceased had told the second wife that the child was not his. (*Id.* at p. 695.) Nevertheless, the second wife knew of the first marriage, and the pregnancy, and was told after the deceased's death that there was "a woman in a local store claiming to be her husband's daughter." (*Ibid.*) There were two main issues—could the second wife truthfully say in her verified petition for possession that her husband had no descendants by blood? The *Hearn* court said no, because the second wife was a resident of the local community, and there was so "much talk" there about the shotgun wedding that it strained "credulity to believe she did not have substantial knowledge of the true facts of the events" leading to the birth of her first husband's child. (*Id.* at p. 696.) The second issue was whether the second wife had an affirmative duty to locate and contact the heir. The court said yes, holding that because the executor had reason to "strongly suspect" there was an unidentified heir whose existence was "well known" in the family and who could have been located with "ease" through "general inquiry" (which apparently included some genealogical research done by the wife of a nephew of the decedent) in the same county where the decedent died, the executor had a duty to find and contact that person. (*Id.* at p. 700.)

Given *Mulcahey* and *Hewett*, we feel reasonably safe in saying that *Hearn* is inconsistent with California law. No petitioner for administration should fear having the estate administration held up by the happenstance of "community gossip" and fortuitous genealogical research done by a family member. The burden on administrators (often widows and widowers) of a Louisiana-style rule, as *Hewett* noted, is simply too great.

that he considered whether Lindella and Lenitra were entitled to notice as heirs under the holding out and reception provisions of Family Code section 7611, subdivision (b), but rejected the idea because Family Code section 7630, subdivision (c) had not been complied with "first." He wrote in his memorandum of points and authorities: "I am not completely clear on the Code and I may be incorrect, but the way I read it, the Petitioners cannot even reach for Section 7611(d) without first complying with Section 7630(c) which applies to determinations involving deceased fathers. Probate Code Section 6453(b) precludes action under Section 7630(c) unless at least one of three exceptions are met by clear and convincing evidence and the Petitioners have met none of those exceptions." The import of Ricky's analysis is that before Lindella and Lenitra could be heirs entitled to personal notice under Probate Code section 8110, they *first* had to bring an action under Family Code section 7630, subdivision (c).

By its terms, though, Family Code section 7630, subdivision (c) contemplates actions to establish paternity even after the death of the putative father. Here is the entire text of the statute: "An action to determine the existence of the father and child relationship *with respect to a child* who has no presumed father under Section 7611 or *whose presumed father is deceased may be brought by the child* or personal representative of the child, the Department of Child Support Services, the mother or a personal representative or a parent of the mother if the mother has died or is a minor, a man alleged or alleging himself to be the father, or the personal representative or a parent of the alleged father if the alleged father has died or is a minor." (Italics added.)

As the emphasized words show, *if* paternity is presumed—and that would certainly include the presumptions of fatherhood set forth in section 7611 of the Family Code, including subdivision (d)—then the child may bring an action after the presumed father's death to establish the existence of the parent and child relationship.

The opportunity to bring an action after the putative father's death is also confirmed by the analysis in *Estate of Sanders* (1992) 2 Cal.App.4th 462 [3 Cal.Rptr.2d 536], where the court had occasion to examine the foundations of Probate Code section 6453 (or, to be precise, its predecessor statute, former Prob. Code § 6408). Commenting on the former statute's "except that the relationship may not be established by" clause, the *Sanders* court noted the obvious disjunctive in the statute's structure: "Subdivision (c)(2), with its 'may' language, merely allows other provisions of the Uniform Parentage Act to be used to establish a natural parent-child relationship *provided that* a court decree declaring paternity was entered while the father was alive *or* there is clear and convincing evidence that the father, while alive, had openly and notoriously held out the child as his own." (*Estate of Sanders, supra,* 2

Cal.App.4th at p. 471.) The current version of the statute as set forth in Probate Code section 6453, subdivision (b) accomplishes the same disjunctive effect through the phrase "any of the following conditions," and then listing those conditions, thus indicating that any one of them is sufficient. And, since one of the conditions is that "[a] court order was entered during the father's lifetime declaring paternity," it follows that the other two provisions contemplate that paternity may be established after the father's death.

Any other conclusion is also inconsistent with *Cheyanna M. v. A.C. Nielsen Co.* (1998) 66 Cal.App.4th 855 [78 Cal.Rptr.2d 335]. There the trial court had granted a summary judgment in a wrongful death action on the theory that the deceased had not held the putative child out as his own, ignoring the fact that such holding out was impossible because he died prior to the child's birth. The court reasoned that under Probate Code section 6453, subdivision (b)(3) the child should be "permitted" to prove paternity, albeit by clear and convincing evidence. (See *Cheyanna M., supra,* 66 Cal.App.4th at p. 877.)

But there is one more aspect of Ricky's analysis that bears comment. When he wrote that Lindella and Lenitra "have met none of [the] exceptions" listed in Probate Code section 6453, with regard to the two that require clear and convincing evidence (subd. (b)(2) & (3)), he was clearly acting, in his role of petitioner for administration of his dead brother's estate, as *trier of fact.* It was partial Ricky, not an impartial judge, who was making the decision as to whether the evidence of public holding out rose to the clear and convincing level.

If the law does not trust real judges—or even administrative hearing officers—to sit on cases where they have a direct financial interest (see *Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017, 1024 [119 Cal.Rptr.2d 341, 45 P.3d 280]), how can it trust the relatives of the deceased? As our Supreme Court recently observed in the analogous context of the right of a parent to inherit from a child, "Typically, disputes regarding parental acknowledgment of a child born out of wedlock involve *factual assertions that are made by persons who are likely to have direct financial interests* in the child's estate and that relate to events occurring long before the child's death. *Questions of credibility must be resolved* without the child *in court to corroborate or rebut the claims of those purporting to have witnessed the parent's statements or conduct concerning the child.*" (*Estate of Griswold, supra,* 25 Cal.4th at p. 912, italics added.) The same adjudicatory dynamics apply to whether children born out of wedlock are heirs of a particular decedent. The determination of public holding out must be made "in court."

Finally, we need only emphasize that such a liberal interpretation of the words "reasonably ascertainable" does not interfere with the need for the

"expeditious resolution of probate proceedings." (See *Tulsa Collection, supra*, 485 U.S. at p. 489.)[8] As the *Sanders* court has noted, the thrust behind the Legislature's requirement of a clear and convincing standard in the holding out cases was to discourage dubious claims. (See *Estate of Sanders, supra*, 2 Cal.App.4th at p. 473.) Thus to the degree that the intestacy laws contemplate the *presentation* of claims by persons born out of wedlock in the non-bright-line scenario where the claim is based on reception into a household and public holding out, there is the counter weight of the clear and convincing to be applied to the *merits* of those claims.

## C. *Application*

The declarations of Lindella, Lenitra, and Carman do not directly address the question of whether Lyndell ever *publicly* held out Lindella and Lenitra as his children. They do, however, swear to long periods of continuous living together in the same household: In 1976 Lyndell, Carman, and Lindella (Lenitra would be born in 1981) all lived together in a house in Compton, and in 1983 Lyndell, Carman, Lindella and Lenitra all moved into the Anaheim house which is the subject of this whole case, and all lived there until Lyndell's death in 1989. (Much of the focus of the declarations is on the assertion that Ricky knew that Lyndell, Carman, Lindella and Lenitra were all part of the same household.)

If the declarations of the moving parties seeking to set aside the order of final distribution had conspicuously failed to say that Lyndell had ever lived with Lindella or Lenitra, or affirmatively recognized that Lyndell had never publicly admitted he was the girls' father, we would be reversing the trial court's decision rather than affirming it. In such a case, *Estate of Ginochio* (1974) 43 Cal.App.3d 412 [117 Cal.Rptr. 565] would be on point—there the record was unequivocal that at no time did the putative father ever admit paternity, or live with the putative child, or receive him into his family. (*Id.* at p. 417; see also *Campbell ex rel. Campbell v. Apfel* (9th Cir. 1999) 177 F.3d 890, 894 [applicant for Social Security benefits conceded he could not meet alternative tests of predecessor statute to Probate Code section 6453].) Accordingly, the putative child was not an heir for notice purposes. In the case before us now, however, the record is equivocal, with conflicting stories and inferences proffered by the respective parties.

---

[8] An example of the need for expeditiousness may be found in *Gertner v. Superior Court* (1993) 20 Cal.App.4th 927 [25 Cal.Rptr.2d 47]. In that case this court vacated a superior court order allowing a late-filed creditors' claim in a case where the creditor received *timely* and *mailed* notice, but, because that notice was to a bank lock box used to collect installment payments, the creditor's legal department did not find out about it until it was too late. (See *id.* at p. 932, fn. 3 ["The focus of the statutes requiring strict compliance with the time limits for filing a creditor's claim is to promote the expeditious distribution of the assets of a decedent's estate."].)

This case comes to us on a favorable standard of review in which reasonable inferences must be drawn in favor of the trial court's decision, regardless of whether the trial court acted under the authority of subdivision (b) of Code of Civil Procedure section 473 or the inherent power of a court to set aside a judgment procured by the extrinsic fraud of keeping an adversary out of court (see *Cross v. Tustin* (1951) 37 Cal.2d 821, 824–825 [236 P.2d 142]; *In re Marriage of Varner* (1997) 55 Cal.App.4th 128, 139–140 [63 Cal.Rptr.2d 894]). Under the former, the standard is abuse of discretion and the trial court's decision is thus entitled to have any reasonable inferences drawn in its favor. (See *In re Marriage of Connolly* (1979) 23 Cal.3d 590, 597 [153 Cal.Rptr. 423, 591 P.2d 911] ["In reviewing the evidence in support of a section 473 motion, we extend all legitimate inferences to uphold the judgment."].) Under the latter, the standard of review is that a determination of extrinsic evidence is accepted on appeal if supported by substantial evidence (see *In re Marriage of Bonds* (2000) 24 Cal.4th 1, 31 [99 Cal.Rptr.2d 252, 5 P.3d 815]), in which case all reasonable inferences from substantial evidence are also drawn in favor of the judgment (see *Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 546 [138 Cal.Rptr. 705, 564 P.2d 857]; see also *Bernhard v. Waring* (1931) 213 Cal. 175, 179 [2 P.2d 32] [inferences as well as facts in complaint were sufficient to allege extrinsic fraud].)

An important distinction must be emphasized at this point. The motion to set aside the final order of distribution was just that: a set aside motion. It was not a motion to establish that Lindella and Lenitra *were* Lyndell's daughters. It was not a proceeding pursuant to Family Code section 7630, subdivision (c) as authorized by Probate Code section 6453, subdivision (b). Its focus was not on proving to the court that Lindella and Lenitra had actually been received into Lyndell's household and publicly held out as his children. Rather, the focus was on *Ricky's* possession of information which would lead a reasonable person to believe that Lindella and Lenitra *could* make a *claim* to the court which would ultimately result in a finding that Lindella and Lenitra had been received into Lyndell's household and publicly held out as his children.

And on that basis substantial evidence in the record gives rise to an inference that he was in possession of such information. Specifically, the evidence supporting the motion established that Lyndell, Carman, Lindella and Lenitra lived in both Compton and Anaheim for long stretches of time, and that Lyndell thought of Lindella and Lenitra as his children. And Ricky knew about it. Moreover, both children were conceived during times when Lyndell and Carman were having sexual relations, and Lenitra was conceived when Lyndell and Carman were living together. ■ It is quite natural to infer that a man who lives with a woman whose two children were conceived and born during times when they were in a "relationship" or "living together"

that he *might* also be making statements to those outside the household that they are his children. Moreover, nothing in the record, as in *Estate of Cornelious, supra,* 35 Cal.3d 461, would have allowed Ricky to rule out Lindella's and Lenitra's claims a priori. Of course, such an inference might not withstand a clear and convincing evidence standard. But the trial judge's decision was whether to allow Lindella and Lenitra to even have the opportunity to present their case, not to determine the merits of it. Given the broad interpretation which necessarily must be given Probate Code section 8110 under *Tulsa Collection, supra,* 485 U.S. 478, the trial judge certainly acted correctly, at the very least under the doctrine of extrinsic fraud if not under section 473 of the Code of Civil Procedure.[9]

## IV.   DISPOSITION

The order is affirmed. Because no case has, until now, discussed the quantum of information a petitioner must have to "reasonably ascertain" whether a given individual is an heir and thus entitled to personal notice, the interests of justice favor having the parties bear their own costs on appeal.

Bedsworth, J., and Ikola, J., concurred.

A petition for a rehearing was denied October 3, 2003, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied December 17, 2003.

---

[9] Because extrinsic fraud is sufficient, we do not need to deal with Ricky's fallback argument, namely that no relief was available under section 473 of the Code of Civil Procedure because none of the prerequisite categories specified in Code of Civil Procedure section 473 (mistake, inadvertence, surprise or excusable neglect) were present. The most indulgent assumption one could make in regard to Ricky's argument is that because Lindella's and Lenitra's attorney recorded Leazer's deed to Lyndell in September 2000, they really cannot claim "surprise." Knowing of Lyndell's death and the fact that the only claim they could make was through Lyndell's estate, they should have petitioned to administrate his estate themselves, and in any event should have been on the lookout for someone else to do it. However, the fact remains that what was before the trial judge was a set-aside motion grounded in extrinsic fraud as well as surprise. Indeed, we have here the archetype of extrinsic fraud, where one party literally keeps the other party out of the courthouse. (E.g., *Purinton v. Dyson, supra,* 8 Cal.2d 322; *Monk v. Morgan, supra,* 49 Cal.App. 154.) Ricky might as well have locked Lindella and Lenitra in a tower for all the chance he gave them to come to court to assert their claims.