Filed 3/14/23  Mann v. Mann CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RENEE MANN,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ALEX MANN, as Trustee, etc.,<br><br>  Defendant and Appellant. | G060341<br>(Consol. with G060342)<br><br>(Super. Ct. Nos. 30-2015-00802939<br> & 30-2016-00832674 )<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Randall J. Sherman, Judge.  Affirmed.

Cliff Dean Schneider for Defendant and Appellant.

Law Offices of Mark C. Fields and Mark C. Fields for Plaintiff and Respondent.

## INTRODUCTION

Alex Mann appeals from orders of the probate court, issued after a 10-day trial. The court invalidated several estate planning documents signed by his mother, Ryoko Mann, on grounds of his undue influence and her lack of capacity.

Alex's sister, Renee Mann, filed two petitions after her mother's death, each concerning changes Ryoko made to trusts that had come into existence upon the death of their father, Jack Mann, Sr. – a survivor's trust and an exemption trust. The petitions sought to invalidate documents signed by Ryoko after Jack, Sr.'s death, documents that substantially changed the terms of the original Mann Family Trust set up by Jack, Sr., and Ryoko. The court consolidated both petitions for trial.

We affirm the court's orders determining that the original Mann Family Trust was the effective instrument and invalidating the documents subsequently signed by Ryoko. Our main reason for doing so is that Alex has waived any claim of error by presenting us with briefs that steadfastly ignore the evidence supporting the probate court's findings and conclusions in favor of evidence that supports his point of view. Since our review is based on substantial evidence, Alex was obliged to state the evidence in favor of the court's decision as well as the contrary evidence. His near absolute failure to do so means that he has waived his claim.

In addition, we have inspected the record, and we are satisfied that the probate court's findings rest on substantial evidence. As we discuss below, we neither reweigh evidence nor reassess the trial court's conclusions about credibility.

## FACTS

Jack, Sr., and Ryoko Mann had three surviving children: Alex, Renee, and Jack, Jr. On February 26, 2010, Jack, Sr., and Ryoko signed the Mann Family Trust,

2

benefiting all three children equally. At the same time, Jack, Sr., and Ryoko executed pourover wills.[1] Jack, Sr., died less than three months later, on May 17, 2010.

Under the terms of the trust, at Jack, Sr.'s death the trust estate was split into three separate trusts: the survivor's trust, the exemption trust, and the marital trust.

**Survivor's Trust**

In the original trust, the assets of the survivor's trust were to be equally distributed to trusts for the children on Ryoko's death. The children received income only and could not draw on the principal.

On December 29, 2011, Ryoko signed the first amendment to the Mann Family Trust, a nine-page document, amending the terms of the survivor's trust. In this amendment, Alex received 40 percent, Jack, Jr., 30 percent, and Renee 30 percent of the survivor's trust on Ryoko's death.[2] The amendment also gave Ryoko's house in Laguna Beach to Alex as his share, with the proviso that if the house was worth more than 40 percent of the survivor's trust, Alex would not have to equalize the disparity with Jack, Jr.'s and Renee's shares. If, however, the house was worth less than 40 percent, the deficiency had to be made up with other trust assets. The amendment appointed Alex and David Vasquez as successor cotrustees and Union Bank if neither would or could serve.[3]

On March 5, 2013, Ryoko signed the second amendment to the trust. In this version, Alex got the Laguna Beach house, Jack, Jr., got 60 percent of the balance of the survivor's trust, and Renee got 40 percent.

On December 19, 2013, Ryoko signed the third amendment to the trust.[4] This version completely disinherited Renee. It gave Alex a 40-percent share in Ryoko's personal property and the option to take the Laguna Beach house. If he took it, then he

---

[1] Ryoko appointed herself to serve as executor of her own will.

[2] Renee is mis-identified in this amendment as Ryoko's son.

[3] The original trust named all three children and David Vasquez as successor cotrustees. David Vasquez was the Manns' accountant.

[4] The title of the document reads "Second Amendment," but it was in reality the third amendment.

would receive 40 percent of the balance of the survivor's trust and Jack, Jr., would receive 60 percent.  If Alex did not take the house, the balance of the survivor's trust would be distributed equally between the brothers.  Jack, Jr., would also receive 60 percent of the value of Ryoko's personal property.  Alex and Wells Fargo were appointed successor cotrustees.

Finally, the fourth amendment to the trust (mislabeled "third amendment") was signed on March 7, 2014.  Ryoko resigned as trustee of the survivor's trust and appointed Alex and Wells Fargo as cotrustees in her place.

**Exemption Trust**

In the original trust document, the exemption trust "consist[ed] of a pecuniary amount equal to the maximum sum that can be allocated to a trust that does any extent [*sic*], without producing any federal estate tax, after taking into account all factors relevant to this estate tax objective . . . ."  Upon Ryoko's death, the remaining principal of the exemption trust was to be distributed equally to Alex, Renee, and Jack, Jr.

On December 29, 2011, Ryoko executed a new will.  The new will specified distribution of the balance of the exemption trust to Alex (40 percent), Renee (30 percent), and Jack, Jr. (30 percent.)[5]  The will contained the same provision regarding Alex's receipt of the Laguna Beach house as the first amendment to the survivor's trust.

On February 28, 2012, Ryoko executed the first codicil to her new will.  As far as the distribution of the exemption trust, the provisions were unchanged.

The record contains a second codicil to the Ryoko's will, purportedly executed on February 28, 2012, but purportedly witnessed on March 5, 2013.  This document contains handwritten underlinings and comments.  According to this document,

---

[5]     Renee is again mis-identified in the will as Ryoko's son.

4

Renee was to receive 40 percent of the exemption trust and Jack, Jr., was to receive 60 percent. The Laguna Beach house went to Alex. Alex was also appointed executor.

On March 28, 2014, Ryoko executed a new will. The will disinherited Renee. The exemption trust was split between Alex (40 percent) and Jack, Jr. (60 percent). The will noted loans made to Alex ($1.9 million) and Jack, Jr., ($164,000) during Ryoko's lifetime and provided that the outstanding balances of these loans would be taken into account when the shares were adjusted.

Ryoko died on July 13, 2015.

On January 29, 2016, Renee petitioned the court regarding the survivor's trust. She filed a separate petition regarding the exemption trust on April 29, 2016. Both petitions named Alex as respondent. In essence, the petitions sought to invalidate the amendments to the survivor's trust and the wills and codicils executed after Ryoko's original will of February 26, 2010.

Trial on both petitions commenced on January 11 and concluded on February 11, 2021. The matter was trifurcated. Phase one, with which this appeal is concerned, was to determine the validity of the various documents signed by Ryoko after Jack, Sr.'s death in May 2010 and the validity of the Mann Family Trust in its original form of February 2010. If the post-February-2010 documents were invalid, then phase two would deal with Renee's damages. Phase three was intended to deal with an accounting submitted by Wells Fargo and Alex's objections to the accounting.

After 10 days of trial, the court issued a 23-page proposed statement of decision on March 12, 2021. The statement of decision became final on April 2, 2021. In the proposed statement of decision, the court recited in meticulous detail the exhibits and testimony upon which it relied to conclude that Ryoko lacked the capacity to understand the documents she was signing and that she was acting under Alex's undue

5

influence.[6]  A few examples of the many instances outlined in the statement of decision follow:

A few months after her husband's death, Ryoko mislaid some gold coins in her house.  She subsequently found them in an unexpected (to her) place.  What was significant about this episode was that Ryoko accused Jack, Jr., of stealing or hiding the coins and stated she had a witness to his conduct.  The court regarded this episode as the first indication of Ryoko's problems with thought processes.

In April 2011, Renee's ex-husband and two of her children sued Ryoko as the trustee of an educational assistance trust set up before Jack, Sr.'s death to benefit their grandchildren.  Ryoko had expressed her desire to close the trust.[7]  Ryoko's reaction to the lawsuit, in addition to intense distress, was to blame Renee, even though Renee was not involved at all and had expressed her disgust at her ex-husband's conduct in instigating the suit.  The lawsuit settled in January 2013 and was formally dismissed in June 2013.

Ryoko continued to blame Renee – going so far as to diminish her portion of the estate and then to disinherit Renee altogether – even after the lawsuit had been dismissed.[8]  Ryoko appeared to be unable to remember that the lawsuit was over well after it had terminated, as she repeatedly fastened responsibility on Renee.  This was part of a larger pattern of behavior regarding Renee, in which Ryoko would swing between

---

[6]     Alex did not include the final statement of decision in his appendix.  We therefore have relied on the proposed statement.  If the court made any changes between the proposed statement and the final one, the record does not reflect them.

The appendix also does not include a register of actions.  See California Rules of Court, rules 8.124(b)(1)(A) and 8.122(b)(1)(F).

It is the appellant's duty to give a complete record for our review.  "Failure to provide an adequate record on an issue requires that the issue be resolved against plaintiff."  (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502.)

[7]     Ryoko apparently denied the existence of the trust.  A copy of an agreement with the trust signed by one of Renee's children in 2009 was attached to the complaint.

[8]     In one email regarding the threat to disinherit Renee and her children, Ryoko cited Probate Code section 21350 as disqualifying them from inheriting by contesting her will.  The court found it highly unlikely that Ryoko was familiar with the Probate Code and concluded that someone, probably Alex, was coaching her.  In fact, no-contest clauses are governed by Probate Code sections 21310 et seq.

6

saying that she loved all her children equally to saying that Jack, Sr., had never liked Renee and did not want her to benefit from his estate.[9]

In January 2013, Jack, Jr., concerned that Ryoko's estate planning attorney, Mark Doyle, was answering to Alex, not to Ryoko, set up a meeting with a different attorney, Randolph Godshall.[10] This meeting took place on January 8, 2013. After the first meeting, Godshall began the process of having Ryoko's file transferred from Doyle to his office, and Ryoko asked him to tell Doyle to "keep the fact of [Godshall's] representation" confidential, because she did not want Alex to know she was changing lawyers.[11]

At the first meeting, Godshall met with Ryoko, Jack, Jr., and Jack's lawyer to get a general sense of what the representation would involve. He then excluded Jack, Jr., and the lawyer and discussed the disposition of her estate with Ryoko alone.

A second meeting took place on January 11 with Ryoko alone. She signed two engagement letters on that date, one for trust administration and the other for estate planning services.

Godshall testified that Ryoko told him she loved her three children equally and generally wanted to benefit them equally.[12] She also said she was not happy with the changes that had been made to her estate plan that favored Alex over the other two children and that she did not "know how those provisions got in there." Godshall drafted

---

[9] This sentiment was of course belied by a trust set up shortly before Jack, Sr.'s death in which all three children were treated equally.

[10] Doyle became Ryoko's estate planning attorney when the lawyer who had drafted the original Mann Family Trust joined his law firm in 2012.

[11] From the statement of decision: "Ryoko said she didn't want anyone, especially Alex, to know [of] the pending change of counsel, because once Alex knew, he would take steps to interfere with Godshall's representation. That concern came true."

Nevertheless, when Doyle responded to Godshall's request for Ryoko's file, he cc'd Alex and Jack, Jr. The court concluded that Doyle was letting Alex know that Ryoko wanted to change lawyers, a move Alex promptly thwarted.

[12] Godshall testified that Ryoko wanted earlier gifts to the children and the expenses she had incurred in responding to the education trust lawsuit factored into the ultimate disposition.

7

some documents reflecting the changes Ryoko had requested and sent them to her for her approval.

Two weeks after their second meeting, Godshall received an email from Ryoko stating that she had never hired him and accusing him of professional misconduct in trying to change her estate plan without her consent. After a few such exchanges, Godshall, understandably alarmed at the possibility (1) that he had been the victim of a hoax by someone who was *not* Ryoko or (2) that Ryoko had significant mental problems, washed his hands of the entire matter, terminated the representation, and declined to send a bill for his services.[13] The court contrasted Godshall's behavior with that of Doyle, who, when he received a similar communication from Ryoko accusing him of professional misconduct, shrugged it off and said he was too busy to respond.

Nearly a year later, Ryoko emailed Godshall on December 18, 2013, the day before she signed the third set of amendments, pleading with him to "please stop what is going on." Godshall, who interpreted this communication as a cry for help, declined to reinvolve himself in Ryoko's affairs.

The court cited multiple instances of Alex's telling Ryoko that she had to give the Laguna Beach house to him to forestall unspecified tax problems with the Internal Revenue Service. (According to one appraisal, the house was valued at $8 million.) The nature of these "problems" was never explained, either to Ryoko or to the court.

In August 2012, Renee begged Alex to have Ryoko's mental health evaluated. He acknowledged that Ryoko was under stress, but stated, "I believe and hope she will soon be fine." The court observed that this was a statement that could be applied to someone's physical health, but not to mental health. A few days later, Alex

---

[13]    Godshall testified that he had had no concerns about Ryoko's mental state when he met with her. After receiving bizarre emails from her, however, he had doubts about her capacity.

Ryoko picked up on Godshall's "hoax" theory, which he stated was not meant seriously, and began claiming that a fake Ryoko was making changes in her estate plan.

told Renee that Ryoko was beyond help. Ryoko's mental status was not professionally evaluated until February 2015.

The court invalidated all of the amendments to the Mann Family Trust signed by Ryoko after Jack, Sr.'s death and reinstated the original trust of February 2010 as the operative document.

Alex has appealed from the final order adjudicating Ryoko's capacity and his undue influence on the grounds that insufficient evidence supports the trial court's conclusions. He also asserts that the court erred in failing to apply the doctrine of laches to Renee's petitions.

## DISCUSSION

**I.        Appealability**

Renee filed a motion to dismiss this appeal as being from a nonfinal order, rather than from a final judgment.[14] The matter is appealable under Code of Civil Procedure section 904.1, subdivision (10), which makes orders under the Probate Code appealable, and Probate Code section 1304, subdivision (a), which makes any final order under Chapter 3 of the Probate Code, commencing with section 17200, appealable.[15] Section 17200, in turn, authorizes proceedings determining questions of construction of a trust instrument and proceedings determining the validity of a trust provision. (§ 17200, subds. (b)(1), (b)(3).)

Nothing in the record suggests that the probate court intends to revisit its findings regarding lack of capacity and undue influence. In fact, on April 22, 2021, the court issued orders invalidating the documents Ryoko signed after Jack, Sr.'s death. The second and third phases of the trial deal with completely different subjects. Indeed, if Alex had not appealed from this "final order" when he did, he very likely would have lost

---

[14]     Renee's counsel withdrew the motion to dismiss at oral argument.

[15]     All further statutory references are to the Probate Code unless otherwise indicated.

the ability to appeal from the probate court's determination that Ryoko lacked capacity and was acting under undue influence at all.

## II.    **Lack of Capacity/Undue Influence**

We note at the outset that *either* a finding of lack of capacity *or* a finding of undue influence would be sufficient to invalidate the estate-related documents Ryoko signed after her husband's death.  (See *Estate of Baker* (1982) 131 Cal.App.3d 471, 485-486.)  We review both findings for substantial evidence.  (*Goodman v. Zimmerman* (1994) 25 Cal.App.4th 1667, 1677-1678 [lack of capacity]; *Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1026-1027, 1033 [undue influence].)

With respect to both issues, Alex has badly misapprehended both our role and his duty when an appellant appeals on the ground of insufficient evidence.  To quote from but one of many articulations of both, "'[A] reviewing court must presume that the record contains evidence to support every finding of fact, and an appellant who contends that some particular finding is not supported is required to set forth in his brief a summary of the material evidence upon that issue.  Unless this is done, the error assigned is deemed to be waived.  [Citation.]  It is incumbent upon appellants to state fully, with transcript references, the evidence which is claimed to be insufficient to support the findings.'  [Citations.]"  (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887.)

Alex's briefs almost entirely ignore the evidence upon which the court relied to make its findings.  Instead, he cites to evidence, usually testimony, in his favor.  He "nowhere set[s] forth the version of events most favorable to plaintiff, although doing so is part of [his] fundamental obligation to this court, and a prerequisite to our consideration of [his] challenge.  'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient.* [Citation.]' [Citation, italics added].  Where a party presents only facts and inferences favorable to his or her position, 'the contention that the findings are not supported by substantial evidence may be deemed

waived.'  [Citation.]"  (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 737-738.)

In addition, the trial court is the exclusive determiner of credibility. (*Bookout v. State of California ex. rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.)  In his opening brief, Alex repeatedly cites the testimony of Doyle, who became Ryoko's estate planning attorney after Jack, Sr.'s death, and whom the court regarded with barely concealed disdain for both his professional and ethical conduct.  The court clearly regarded Doyle as working to further Alex's interests, not Ryoko's, and we are not empowered to gainsay this assessment.[16]

Although Alex has waived his assertions of error by failing to summarize the evidence unfavorable to him, we will briefly discuss each of his claims.  Substantial evidence supports each of the court's findings on the contested issues.

### A.    Lack of Capacity

Section 6100.5, subdivision (a), provides:  "An individual is not mentally competent to make a will if, at the time of making the will, either of the following is true: [¶] (1) The individual does not have sufficient mental capacity to do any of the following: [¶] (A) Understand the nature of the testamentary act. [¶] (B) Understand and recollect the nature and situation of the individual's property. [¶] (C) Remember and understand the individual's relations to living descendants, spouse, and parents, and those whose interests are affected by the will.  [¶] (2) The individual suffers from a mental health disorder with symptoms including delusions or hallucinations, which delusions or hallucinations result in the individual's devising property in a way that, except for the existence of the delusions or hallucinations, the individual would not have done."

Section 810, subdivision (b), provides, "A person who has a mental or physical disorder may still be capable of . . . executing wills or trusts . . . ."  Section 811,

---

[16]     The court found Godshall to be the "most credible witness in this case" and repeatedly contrasted his professional conduct with that of Doyle.

11

subdivision (a), lists deficits in mental functioning – alertness, information processing, thought processes, and ability to modulate mood – that, coupled with evidence of a correlation between the deficits and the decision or act at issue, support a determination of lack of capacity. Subdivision (b) cautions that a mental function deficit may be considered only if it "significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question." Section 812 provides that a person lacks the capacity to make a decision unless the person can communicate the decision and understand its rights, duties, and responsibilities; its probable consequences; and its risks, benefits, and alternatives.

Whether to apply the standard of sections 811 and 812 or the significantly lower standard of section 6100.5 to a trust depends on the complexity of the trust document. To the extent a trust document resembles a will, "it is appropriate to look to section 6100.5 to determine" the trustor's capacity. "More complicated decisions and transactions . . . appear to require greater mental function . . . ." (*Andersen v. Hunt* (2011) 196 Cal.App.4th 722, 730-731.) The capacity to understand and approve a more complex trust document is evaluated under sections 810 through 812. (See *Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1352-1353 (*Lintz*).)

Although Alex bases his capacity argument on section 6100.5, it is clear from the statement of decision that the trial court was chiefly relying on the standard set out in sections 810 through 812.[17] The statement of decision repeatedly refers to Ryoko's problems with memory and logical reasoning.

In light of the complexity of the estate planning documents Ryoko signed after February 2010, we agree with the trial court that sections 810 through 812 provide

---

[17] When it gave its ruling orally at the end of trial, the court specifically cited section 811 and stated its conclusion that the evidence was "chock-full of . . . memory issues, thought processes, logical [*sic*] reasoning, disorganized thinking, delusions, mood issues." The court declined to use the standard of section 6100.5 because "the trust amendments are anything but simple." In an abundance of caution, the court also discussed Ryoko's lack of capacity under section 6100.5.

the correct standard by which to measure Ryoko's capacity. Although some of the documents were wills, they dealt primarily with changing the terms of the exemption trust and so had to be evaluated for capacity as trust documents.

### B.      Undue Influence

Section 86 refers to Welfare and Institutions Code section 15610.70 as providing the definition of undue influence. Welfare and Institutions Code section 15610.70, subdivision (a) provides, "'Undue influence' means excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity" and provides a detailed list of the factors the court is to consider in determining its existence.[18]

Our Supreme Court has defined undue influence in testamentary matters as "pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency." "Although a person challenging the testamentary instrument ordinarily bears the burden of proving undue influence . . . , this court and the Courts of Appeal have held that a presumption of undue influence, shifting the burden of proof, arises upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the

---

[18] These are: "(1) The vulnerability of the victim. Evidence of vulnerability may include, but is not limited to, incapacity, illness, disability, injury, age, education, impaired cognitive function, emotional distress, isolation, or dependency, and whether the influencer knew or should have known of the alleged victim's vulnerability. [¶] (2) The influencer's apparent authority. Evidence of apparent authority may include, but is not limited to, status as a fiduciary, family member, care provider, health care professional, legal professional, spiritual adviser, expert, or other qualification. [¶] (3) The actions or tactics used by the influencer. Evidence of actions or tactics used may include, but is not limited to, all of the following: [¶] (A) Controlling necessaries of life, medication, the victim's interactions with others, access to information, or sleep. [¶] (B) Use of affection, intimidation, or coercion.[¶] (C) Initiation of changes in personal or property rights, use of haste or secrecy in effecting those changes, effecting changes at inappropriate times and places, and claims of expertise in effecting changes. [¶] (4) The equity of the result. Evidence of the equity of the result may include, but is not limited to, the economic consequences to the victim, any divergence from the victim's prior intent or course of conduct or dealing, the relationship of the value conveyed to the value of any services or consideration received, or the appropriateness of the change in light of the length and nature of the relationship." (*Ibid.*)

testamentary instrument." (*Rice v. Clark* (2002) 28 Cal.4th 89, 96-97; see also Civ. Code, § 1575.)

Citing Alex's control of information, his knowledge of Ryoko's impaired mental state, and the violation of her previously expressed wishes, the trial court concluded that Renee had provided clear and convincing evidence of Alex's undue influence over Ryoko. The court cited multiple instances in the statement of decision, such as Alex's interactions with Godshall, that established undue influence.

Alex's argument on this issue assumes that he had to be sitting in the same room with Ryoko when she signed the estate planning documents or he had to write the amendments himself in order to unduly influence her. On the contrary, "'[d]irect evidence as to undue influence is rarely obtainable and hence a court or jury must determine the issue of undue influence by inferences drawn from all the facts and circumstances.' [Citations.] Thus, while pressure must be brought to bear directly on the testamentary act, the pressure, or undue influence, may be established by circumstantial evidence. [Citation.] As a matter of law, the probate court's undue influence finding need not be supported by direct evidence of undue influence at the moment decedent signed the trust instruments." (*Lintz, supra,* 222 Cal.App.4th at p. 1355.)

The trial court referred to numerous pieces of evidence that established Alex's undue influence over Ryoko. For example, Goshall testified that Ryoko expressed confusion about how her estate plan had taken on its present form and told him it was from Alex getting her to do things with her estate plan that she didn't want to do. Alex refers to none of this evidence, let alone explains why it is not substantial evidence of undue influence.

## III.      Delay

Ryoko died on July 13, 2015. Renee filed her petition to invalidate the Survivor Trust amendments on January 29, 2016. She filed her petition to invalidate the Exemption Trust amendments on April 29, 2016. In finding that laches did not apply, the

court correctly noted that the trust amendments technically could have been changed again before Ryoko's death, if a conservator had been appointed for her, thus obviating the need to file any petitions. Additionally, filing a petition during her lifetime would have been especially traumatic, given her reaction to being sued by her ex-son-in-law and her grandchildren.

Alex argues that delay prejudiced him because if Renee had brought her actions while Ryoko was still alive, her mental state could have been evaluated as well as Alex's supposed influence over her. Waiting until Ryoko was dead made this evidence unavailable and allowed the probate court to "make assumptions to fill in the voids."

Alex ignores the evidence of Renee's plea to have her mother's mental state evaluated in 2012, which he turned aside with the unfounded hope that she would "soon be fine."

Ryoko's mental state was professionally evaluated on February 13, 2015, at which time she was found to be suffering from an insidious onset of Alzheimer's dementia with delusions. The examiner concluded that Ryoko's overall cognitive ability required a supervised living environment. At the time, Ryoko was living alone in the Laguna Beach house.

"Generally speaking, the existence of laches is a question of fact to be determined by the trial court in light of all of the applicable circumstances, and in the absence of manifest injustice or a lack of substantial support in the evidence its determination will be sustained." (*Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624.) The "assumptions" of which Alex complains are better described as "reasonable inferences," which we are bound by the substantial evidence standard of review to draw in favor of the judgment. (See *Estate of Carter* (2003) 111 Cal.App.4th 1139, 1154.) The trial court's determination rests on substantial evidence, and we may not reweigh evidence.

15

## DISPOSITION

The order of April 22, 2021, determining the Mann Family Trust of February 26, 2010, to be effective and operative and invalidating subsequent amendments to the Mann Family Trust and the subsequent wills and codicils of Ryoko Mann is affirmed.  Respondent is to recover her costs on appeal.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.

16